**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| APACHE APARTMENTS OF OWATONNA, et al., | ) | |
| | ) | File No. 96-700C |
| Plaintiffs, | ) | Judge Block |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF DAVID S. LAIDIG**

I, David S. Laidig, declare as follows:

1. I am an attorney with the law firm of Eckland & Blando LLP. I make this Declaration in support of Plaintiffs' Motion to Stay Trial. All facts asserted herein are based upon my personal knowledge.

2. Attached hereto, as Exhibit A, is a true and accurate copy of excerpts from the Expert Report of Bret M. Dickey in *Apache Apartments of Owatonna, et al. v. United States*. *See* Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 17, 2006 in Minneapolis, Minnesota.

David S. Laidig

Eckland & Blando LLP
500 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
Tel: (612) 236-0160
Fax: (612) 236-0179

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Apache Apartments of Owatonna, A Limited Partnership, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 96-700C Judge Block |
| UNITED STATES, | ) | |
| Defendant. | ) | |

# EXPERT REPORT OF BRET M. DICKEY



EXHIBIT A

notice to its tenants informing them of its intention to prepay its mortgage on or after November 1, 1998.[46] In July 1998, the tenants along with other parties filed a lawsuit against HUD and Hopkins Village alleging illegal prepayment and termination of the property's Section 8 contracts.[47] In March 1999, three years after HOPE, Hopkins Village sold the property to Community Housing Development Corporation, a non-profit organization for approximately $5.5 million.[48]

## IV. Economic Impact

### A. Methodology

21. LIHPRHA replaced owners' unilateral ability to prepay their HUD mortgages after the properties' prepayment eligibility dates with a process whereby owners were required to seek HUD approval to prepay their mortgages. The fundamental economic impact of this on the plaintiffs in this case was to alter the market value of the multifamily housing projects that they owned. From an economic perspective, the most appropriate measure of the economic impact of LIHPRHA, therefore, is the change in the value of these assets. The benefits of measuring economic impact using a diminution-in-value approach include:

- It measures the impact of LIHPRHA on the value of the property *as a whole*, incorporating the value of all of the future cash flows and other economic benefits expected to flow from the property, rather than narrowly focusing on a particular subset of these benefits during a particular time frame.
- It properly incorporates the duration of the taking.
- It measures the impact using an ex-ante approach (using information available to the market at the time)
- It properly discounts future cash flows, accounting for the risks associated with operating the apartment project and the time value of money.
- It values these cash flows at the beginning of any delay period, rather than at the end.

---

[46] Deposition of Jeff Hagen, January 13, 2005, pp. 69-70 and Exhibit 16.
[47] Hopkins Villagers, et al., v. the United States Department of Housing and Urban Development, et al., Complaint, July 30, 1998 (P-AP 13441-59).
[48] Deposition of Jeff Hagen, January 13, 2005, p. 82; Hopkins Village, Closing Booklet (P-AP 13074).

22. I understand that in *Cienega Gardens*, the Federal Circuit ruled that a necessary condition for a taking to be compensable is that it must have caused a plaintiff "serious financial loss."[49] In my opinion, the most appropriate measure of the seriousness of any financial loss is the percentage decrease in the value of the plaintiff's property directly resulting from the passage of LIHPRHA (as modified by the subsequent passage of HOPE).

**B. Economic Impact of ELIHPA and LIHPRHA on Plaintiffs' Properties**

23. I have been asked by the Government to calculate a measure of the economic impact of ELIHPA and LIHPRHA on plaintiffs' properties.

24. I understand that the Government has retained an appraiser, Dan Mueller, to perform a retrospective valuation of plaintiffs' properties as of their prepayment eligibility dates. Specifically, Mr. Mueller was asked to calculate two separate values: (1) the market value of the property on its prepayment eligibility date assuming that plaintiffs could have prepaid and converted to market-rate operations immediately, and (2) the market value of the property on its prepayment eligibility date assuming that the property would remain in the HUD program until the earlier of (a) the date on which the owner signed a new Use Agreement, or (b) 60 days after the passage of HOPE, at which point it would convert to market-rate operation.[50] I will use the term "delay period" to refer to the period between Mr. Mueller's two assumed conversion dates. A comparison of Mr. Mueller's two retrospective valuations provides an estimate of the effect of delaying prepayment from the property's eligibility date until the later date.

25. Specifically, by measuring economic impact as the percentage decrease in the asset value resulting from the delay, I derived the following estimates of economic impact:

---

[49] 331 F.3d at 1340.

[50] More accurately, Mr. Mueller computes three values, the third value being the fully stabilized market value of the property on the property's prepayment eligibility date (i.e., without considering conversion costs).

**Table 1**

| Property | % Economic Impact |
|---|---|
| Apache Apartments | 5.5% |
| Brainerd South Apartments | 14.9% |
| Eagan Gardens Apartments | 2.6% |
| Hopkins Village | 14.3% |
| Morningside Terrace | 8.9% |
| Rochester Square | 16.6% |
| Waseca Apartments | 5.6% |

26. As shown in Table 1, the economic impact of ELIHPA and LIHPRHA was to decrease the value of the plaintiffs' properties by a range of 2.6% (Eagan Gardens) to 16.6% (Rochester Square). Exhibit 2 presents the details underlying these calculations.

27. I note that a measure of economic impact based on the delay in the owners prepaying their mortgages (or accepting incentives) is conservative for several reasons. First, for those plaintiffs that did not accept the incentives offered under Title II and Title VI, the measure completely ignores the value of these incentives, and rewards plaintiffs for their inaction, to the extent that the inaction prolonged the delay in prepaying their mortgages. Second, for those properties that did accept incentives, the measure incorporates the impact of any delay in receiving these incentives that was not the fault of the government. For example, both Rochester Square and Brainerd South failed to take advantage of the opportunity to file a notice of intent a full two years before their prepayment eligibility date.

28. Under LIHPRHA, each of the plaintiffs had the right to sell their property to a qualified buyer at the property's appraised value (at its highest and best use),[51] at which point they could have used the sale proceeds as they wished, including reinvesting them in another conventional apartment project. Therefore, revealed preference suggests that plaintiffs found the options they did pursue at least as valuable as a sale for the appraised value.

[51] If such a buyer could not be found, an owner could have prepaid its HUD-insured mortgage.

**C. Dr. Karvel's Measure of Economic Impact**

29. While Dr. Karvel doesn't specifically express an opinion on economic impact, his report contains what he refers to as "a simple return on equity analysis…consistent with the court's decision in *Cienega Gardens v. United States*, 331 Fed. Cir. 1319 (2003)."[52] Specifically, he concludes that "the owners' return on equity in their properties during the damage period is generally well below a 1% return."[53] In his report, however, Dr. Karvel does not draw any explicit conclusions from these results, and does not offer any opinions as to how these calculations should be used in measuring economic impact, or whether the economic impact suffered by plaintiffs was substantial.

30. Below, I offer a preliminary evaluation of the relevance of Dr. Karvel's return on equity analysis in measuring economic impact.[54] In general, Dr. Karvel's return on equity calculation does not provide a meaningful insight into the economic impact of LIHPHRA on the plaintiffs' properties, or of the seriousness of any financial loss. There are several fundamental problems with this approach.

(a) First, Dr. Karvel's return on equity calculation focuses exclusively on the stream of cash flows that would be received during his delay period, and ignores the cash flows and other benefits expected by plaintiffs after this period, when they were free to prepay their loans without HUD approval and convert to market operations. Therefore, it ignores the impact of any taking on the value of the plaintiffs' properties as a whole, and instead focuses on a narrowly defined subset of the property's value.

(b) Second, as described more fully below, Dr. Karvel's "return" only focuses on the allowable dividend, and ignores potentially significant components of the property's return during the delay period. For example, focusing only on the allowable dividend fails to consider (1) the increase in equity that plaintiffs obtained by paying down the

---

[52] Karvel Report, ¶ 41. See also, Karvel Report, Addendum D.

[53] Karvel Report, ¶ 44. Specifically, his calculations show average returns on equity ranging from 0.58% to 1.10% (Karvel Report, Addendum D).

[54] I expect to offer a more detailed evaluation of Dr. Karvel's methodology (including flaws in its implementation) should he use these calculations in a complete analysis of economic impact. I note, for example, that Dr. Karvel's measure of "value" is often based on the higher owner's appraisal and completely ignores the HUD appraisal, which was an important determinant of the property's preservation value under Title VI.

principal of their HUD-insured mortgage with project funds, (2) any additional increase in equity due to appreciation of the market value of the property, and (3) any portion of net operating income reinvested to upgrade the property or otherwise improve its value.

(c) Third, a measure of annual return on equity is a "snapshot" – that is, it focuses on a single point in time – and as such is fundamentally incapable of factoring in the duration of any taking. Such a measure would yield the same estimate regardless of whether the delay lasted one month, one year, ten years, or 50 years.

31. Using a diminution-in-value approach, as I propose above, rather than a narrow return on equity calculation, avoids all of these problems. By definition, it incorporates the economic value of the property as a whole, considers both the cash flows that may have been lost as a result of any delay as well as the other benefits from ownership that were unaffected by the delay, and incorporates the duration of the taking. Moreover, this measure of economic impact is unaffected by the specific mix of debt and equity chosen by a particular plaintiff.

32. Finally, if one assumes for the sake of argument that return on equity over a limited time frame is a relevant measure of economic impact, it would then demonstrate that the decision of many plaintiffs not to accept the incentives by HUD was economically irrational. LIHPHRA provided financial incentives to owners in order to encourage them to preserve their properties as low-income housing. One of these incentives (indeed, an incentive accepted by Rochester Square and Winona Properties)[55] was an increase in the annual dividend allowed – from the 6% of initial equity allowed by the original regulatory agreement to 8% of current equity (or in some cases, an unlimited dividend, dependent only on surplus cash flow from the property). The return on equity available if the owners had accepted incentives under Title II and Title VI would have been significantly higher than the less than 1% return that Dr. Karvel calculates plaintiffs did earn.[56]

---

[55] As described above, an increased dividend was only one of several incentives available.

[56] The Court in *Cienega Gardens* used the rate on Fannie Mae bonds (8.5%) as a basis for comparison. By this metric, the 8% of equity available under LIHPRHA would amount to a decrease of only 6% [(8.5% - 8%)/8.5%].

## VI. Conceptual Flaws in Dr. Karvel's Report

### A. Discounted Cash Flow Model

45. As discussed above, in my opinion the most economically meaningful way to determine the economic impact of LIHPRHA on the plaintiffs' properties is to measure the diminution, if any, in the value of these properties that directly resulted from the changes introduced by LIHPRHA. In contrast, Dr. Karvel purports to measure the lost cash flows that plaintiffs allegedly incurred as a result of the legislation.

> If done correctly, a lost cash flow model can be an appropriate way to measure damages – indeed, if done correctly it should yield approximately the same answer as a diminution-in-value approach. It is a fundamental principle of economics and finance in general, and real estate economics and finance in particular, that the value of an income-producing asset should be equal to the net present value of its future cash flows. For example, as explained by a leading real estate textbook The rationale for the income capitalization approach to value is based on the premise that because improved real estate is capable of producing a flow of income over its economic life, investors will pay a price that reflects the income potential of the property. That is, there is a relationship between income and value.[66]

46. In other words, the value asset owned by each plaintiff in this case is equal to the net present value of its future income/cash flows. Given this relationship between income and value a proper economic approach should arrive at the same conclusion about the impact of the taking, whether it is analyzing the value of the asset or the cash flows. But as presented in more detail below, Dr. Karvel's methodology suffers from a long list of significant flaws in its conception and implementation. As a result, his calculations shed no light on the diminution in value of plaintiffs properties and significantly overstate the just compensation to which the plaintiffs are entitled.

---

[66] Breuggeman, William B. and Jeffrey D. Fisher, *Real Estate Finance and Investments, Tenth Edition, Boston*: Irwin McGraw-Hill, 1997, p. 283.