**B. Dr. Karvel Cites No Evidence To Support His Conclusions**

47. In evaluating the economic impact of LIHPRHA on these properties, the key question is: was the ability to prepay the mortgage and convert the property to market-rate operation a viable opportunity for these plaintiffs at some point during the delay period?

48. The determination of whether a property could have and would have prepaid at its earliest possible opportunity (or at some later point in the delay period) depends critically on expectations, at the time of prepayment, regarding market rents, expenses, conversion costs, terms of conventional financing, and other considerations. As discussed in more detail below, Dr. Karvel appears to have done little investigation into the specific prospects for these particular properties, instead relying on broad and unsupported assumptions to reach his conclusion that it was in the owners' interest to prepay. Without a careful analysis of each plaintiff's unique circumstances, Dr. Karvel's conclusions about the owners' ability to prepay, and any damages they suffered, are speculative and unreliable.

49. In fact, HOPE allowed owners of over 3,300 Section 236 properties to prepay without HUD approval. Yet only approximately 1,100 (34 percent) of these properties had actually prepaid their mortgages and exited the program as of December 31, 2004.[67] For many properties, the highest and best use appears to be as subsidized housing for low-income tenants, rather than as market-rate housing.

**C. End date of damages**

50. In his current model, Dr. Karvel calculates damages for each plaintiff from its prepayment eligibility date until it (1) signed a Use Agreement, (2) sold the property, or (3) prepaid the HUD-insured mortgage after HOPE. I note that for some plaintiffs, his damages period extends well beyond the point at which HOPE restored all of the owners' prepayment rights. For Waseca Village, for example, Dr. Karvel calculates damages through April 2002, when the property was sold. Moreover, Dr. Karvel has indicated that

[67] Department of Housing and Urban Development, Terminated Multifamily Mortgages Databases (http://www.hud.gov/offices/hsg/comp/rpts/mfh/mf_f47t.cfm); Department of Housing and Urban Development, Insured Multifamily Mortgages Databases ( http://www.hud.gov/offices/hsg/comp/rpts/mfh/mf_f47.cfm).

"many owners continued to suffer damages even after [the endpoint he has used in his current model] due to continuing agency-imposed obligations and/or the continuing presence of low-income tenants at their properties."[68]

51. HOPE restored plaintiffs' ability to prepay without HUD approval in March 1996 (subject to a 60-day period when rents could not be raised). Many owners prepaid their HUD-insured mortgages shortly after HOPE, including Tonka Gardens, one of the plaintiffs in this case (which prepaid in September 1996). Dr. Karvel has provided no explanation as to why, for example, the fact that Waseca waited six years after HOPE, should be appropriately attributed to the passage of LIHPRHA. By attributing these losses to LIHPRHA, Dr. Karvel increases his measure of damages.

52. Moreover, Dr. Karvel has indicated that he will calculate additional damages after the end of his current damages period. Dr. Karvel has provided no explanation as to what the "continuing agency-imposed obligations" were or why LIHPRHA should be held responsible for any loss in cash flow extending beyond 60-days after HOPE. I expect to respond in more detail on this issue, if and when Dr. Karvel modifies his damages period and more fully lays out the foundation for his conclusions.

**D. Valuation Date**

53. I have been instructed by counsel that, from a legal perspective, the proper date to value a temporary taking is the beginning of the takings period. This is also the correct approach from an economic perspective – it is consistent with fundamental concepts in economics and financial valuation.

54. In contrast, Dr. Karvel measures damages as of the end of his damages period.[69] This is consistent with the Court's opinion in *Independence Park*. In that opinion, the Court concluded that, while the proper valuation date for a permanent taking is the time of the taking (i.e., the beginning of the delay period), the proper valuation date for a temporary taking is the end of the delay period.[70] The approach outlined in *Independence*

[68] Karvel Report, ¶ 1.
[69] See, for example, Karvel Report, ¶ 28.
[70] *Independence Park Apartments v. United States*, 61 Fed. Cl. 692 (Fed. Cl. August 27, 2004), p. 21.

ownership of conventional rental properties in a metropolitan area."[85] Finally, Dr. Karvel concluded that "to the extent that subsidized housing generally exhibits slightly higher occupancy rates than conventional housing, subsidized housing is properly assigned a slightly lower risk factor for purposes of determining discount rates."[86]

(c) In *Grass Valley Terrace v. United States*, another case involving Section 515 properties, Dr. Karvel recently submitted a first amended report where he uses discount rates of 14% (for market-rate operations) and 11% (for subsidized operations) "pursuant to" the Court's opinion in *Franconia Associates*.[87]

*3. Market-Rate Discount Rates*

65. A useful starting point for determining the appropriate discount rate is the Korpacz Survey, a widely regarded publication on capitalization rates, discount rates, and other real estate data. The Korpacz Survey is published four times a year and contains detailed discount rate information on a variety of real estate investment types.

66. During the 1992 to 1994 period (the time of plaintiffs' prepayment eligibility dates), the Korpacz Survey reported discount rates in the range of 9% to 15%, with average rates consistently in the range of 11.4% to 11.8%.[88] The rates reported in the Survey in these years, however, are for institutional-grade real estate where the investment is on an all-cash basis. Two aspects of the market-rate cash flows analyzed by Dr. Karvel require a higher discount rate. First, the plaintiffs' properties possess few of the qualities associated with institutional-grade real estate. Rather, the plaintiffs' properties are characteristic of non-institutional grade property, which are riskier to operate and therefore require higher discount rates. Second, plaintiffs' investments would not have been all cash, but will be accompanied by significant leverage. Because leverage increases the risks of cash flows to the equity holders, this too requires a higher discount rate.

---

[84] Karvel Chancellor Report, ¶ 20.
[85] Karvel Chancellor Report, ¶ 21.
[86] Karvel Chancellor Report, ¶26.
[87] *Grass Valley Terrace v. United States*, First Amended Report of George R. Karvel. Ph.D., March 17, 2005, ¶ 24-25.

67. As defined by the Korpacz Survey in 1994:

> Institutional-grade real estate is 'brochure quality.' It is located in a major market or submarket that is recognized in the institutional investment community. The property is impressive, has 'street appeal.' The physical characteristics of institutional-grade real estate include large size; high-quality construction, above-average architectural design, configuration, and layout; modern mechanical systems, sprinklers, heat and smoke detectors, and alarms; good amenities; and in some areas and property types, good adjacent parking. The property is in excellent condition and is less than 10 years old or has an effective age of less than 10 years.
>
> In general…the property has low leasing risk, proven stable occupancy, a preponderance of financially strong tenants, and good long-term growth potential."[89]

68. In contrast, plaintiffs' properties possessed very few of these qualities in the early 1990s. They were 20 years old, generally in less than excellent condition and had no experience leasing to market-rate tenants and therefore no proof of stable occupancy. The nature of non-institutional grade properties in general, and plaintiffs' properties in particular, creates a higher risk in operating these properties than in operating institutional grade properties. As described by the Korpacz Survey:

> The physical and financial characteristics of institutional-grade property are such that the degree of risk is lower than in noninstitutional-grade property. Superior improvements in a superior location reduce risk related to physical deterioration and functional and external obsolescence. Superior occupancy and tenancy reduce financial risk.[90]

69. In the early 1990s, the Korpacz Survey did not separately report statistics for non-institutional grade properties, but an examination of institutional/non-instututitonal grade spreads in recent years suggests that the appropriate premium for non-institutional grade properties is approximately 1.5%.[91] As described by these reports, "as would be expected, the IRRs [discount rates] are higher for non-institutional grade property than

[88] Korpacz Real Estate Investor Survey ("Korpacz Survey"), First Quarter 1992 (p.16), First Quarter 1993 (p.15), Third Quarter 1993 (p. 16), Second Quarter 1994 (p.18), and Fourth Quarter 1992 (p. 15).
[89] Korpacz Survey, Second Quarter 1994, pp. 4-5.
[90] Korpacz Survey, Second Quarter 1994. p. 4

for institutional grade property, reflecting the greater risk of owning non-institutional grade property."[92]

70. Moreover, Dr. Karvel assumes that plaintiffs would have prepaid their HUD-insured mortgages not entirely with cash but using loans with a market rate of interest. As such, the properties would have continued to be significantly leveraged and their cash flow after debt service would have been consequently riskier. The Korpacz Survey does not provide estimates of the leverage premium in every issue, but comments on it periodically. In the First Quarter 1994 issue, the survey found equity leverage premiums (based on a 50% leverage ratio) to be in the range of 2 to 3%.[93] In more recent years, average leverage premiums have been closer to 1%.[94]

71. I conclude that the a conservatively low estimate of the appropriate discount rate for the leveraged market-rate cash flows in Dr. Karvel's model is 14% – equal to the institutional grade discount rates of roughly 11.5% from the Korpacz Surveys, plus a non-institutional grade premium of roughly 1.5%, plus a leverage premium of roughly 1%. This is the same rate that Dr. Karvel has used in his analysis in *Chancellor Manor* and *Grass Valley Terrace*.

72. I note that plaintiffs have testified that they would require returns in excess of 14% to invest in commercial real estate. Jeff Hagen testified that he "won't do it" for less than a 16 percent return on his investment after a property is built and leased up.[95]

*4. Subsidized Discount Rates*

73. In contrast, as acknowledged by Dr. Karvel in his previous opinions, the risks associated with subsidized apartment projects are generally lower than the risks associated with market-rate properties.

74. In his expert report, Dr. Karvel asserts that

---

[91] Korpacz Survey, First Quarter 1999, p. 6.
[92] Korpacz Survey, Second Quarter 1999, p. 5.
[93] Korpacz Survey, First Quarter 1994, p. 8. I note that, based on the appraised values Dr. Karvel used in his return on equity calculations, the leverage ratios implicit in his analysis are generally near 50%.
[94] Korpacz Survey, Third Quarter 1999, p. 8.
[95] Deposition of Jeffrey Hagen, January 13, 2005, pp. 13-14.

> The risk levels for the properties at issue here operated within the market-rate scenario, as compared to within the restricted-rent scenario, are relatively commensurate with one another, by virtue of the fact that many of the factors involved – e.g., location, demographics, inflation, etc. – are the same irrespective of whether the properties remain in the program or convert to market-rate housing properties. In addition, irrespective of whether they are operated within the market-rent or the restricted-rent scenario, the properties rely upon high occupancy rates to ensure stable income levels.[96]

75. By Dr. Karvel's logic, all investments in income-producing property would have "relatively commensurate" risks, as they rely upon high occupancy rates to ensure stable income levels. The important question is not whether or not properties *rely* on high occupancy rates – the question is: what is the risk that the property will not achieve these rates. It is clearly the case that occupancy rates will generally be the same for subsidized and market-rate properties. Subsidized properties, by virtue of their below-market rent levels, generally have long waiting lists leading to high occupancy rates.[97] Moreover, projects with Section 8 assistance have up to 80% of their vacancy losses covered by HUD for up to two months.[98] Market-rate properties do not enjoy these same benefits.

76. Similarly, Dr. Karvel's statement that the "demographics" are the same in both cases is also entirely incorrect. Standing at plaintiffs' prepayment eligibility dates (or at the end of Dr. Karvel's damages period), these properties had long (20+ years) operating histories as subsidized projects, and are very familiar with the "demographics" of the area and how this affects rents and occupancy (as described above, there was generally a large supply of low- and moderate-income tenants willing to rent at below-market rent levels). In contrast, the plaintiffs' properties had no experience with what the "demographics" of the area would mean for rents and occupancy levels if they were to convert to market-rate operations. The fact that there is a large supply of low-income tenants says nothing about the supply of market-rate tenants. In fact, the two may be inversely correlated in some

[96] Karvel Report, ¶ 25.
[97] Plaintiffs in this case have testified to high occupancy levels at their subsidized properties. See for example, Deposition of Jeff Hagen, January 13, 2005, p. 88. In contrast, one plaintiff who had converted his property to conventional operation testified that he wished the property had higher occupancy. Deposition of Robert Thimmesh, August 27, 2004, p. 49.

cases (a plant closing may significantly decrease the supply of market-rate tenants while simultaneously significantly increasing the supply of low-income tenants).

77. The budget-based nature of rents in the Section 236 program also lowers the risk of operation. Owners can request rent increases from HUD to cover increases in operating expenses, regardless of local economic conditions. This is a luxury not enjoyed by owners of market-rate properties. Market-rate financing necessary to prepay a HUD-insured mortgage and convert to conventional operation may be recourse financing, in contrast to plaintiffs' HUD-insured loans, increasing the risk to the borrower.

78. Unlike market-rate apartment properties, surveys of discount rates used to value subsidized apartment projects are not widely available. However, inferences about the appropriate discount rates can be made from several sources.

79. First, as described above, the risks of operating plaintiffs' properties as HUD-subsidized projects are lower in several respects than the risks of operating them as conventional properties. According to the Korpacz Surveys, the low end of the range of all-cash, institutional grade market-rate discount rates during the 1992 to 1994 period is consistently between 9% and 10%.[99] While, as I describe above, plaintiffs' properties are in fact non-institutional grade, when operated as part of the HUD programs, these properties enjoy benefits (such as long waiting lists and compensation for vacancy losses) that even the highest quality conventional projects generally do not enjoy. Therefore, the low-end of the Korpacz range for institutional-grade properties is a useful basis of comparison with lower-risk subsidized housing properties.

80. Second, I note that subsidized returns lower than 10% have been sufficient to induce for-profit developers to invest in federally subsidized housing projects. I note in particular that, beginning in 1989, all recipients of subsidized loans from the Department of Agriculture's Section 515 program did not have any prepayment option, and agreed to rent their projects to low-income tenants and limit returns to partners to 8% of original

---

[98] Hopkins Village Housing Assistance Payments Contract (MIN 0030248-64).
[99] Korpacz Survey, First Quarter 1992 (p.16), First Quarter 1993 (p.15), Third Quarter 1993 (p. 16), Second Quarter 1994 (p.18), and Fourth Quarter 1992 (p. 15).

equity for the duration of the loan (up to 50 –years). While many investors were able to obtain tax credits to facilitate the development of these properties, a substantial number were not, suggesting that they were willing to invest in these properties for relatively low returns,[100] reflecting the relatively low risk.

81. Finally, I note that 10% is the same rate that Dr. Karvel uses to discount subsidized cash flows in his model.

**G. Prejudgment Interest**

82. Dr. Karvel calculates prejudgment interest using a rate of 6% based on "historical ten-year treasury yields dating back to 1971."[101] He provides no economic justification for his choice of rate, merely indicating that it is "conservative" and "consistent with the…rate utilized in the Court's decision in *Independence Park*."[102]

83. The appropriate prejudgment interest rate is a rate that corresponds with the level of risk and the duration between the point damages are calculated and the time judgment is awarded. The Court in *Independence Park* selected "an interest rate on a security that approximately matches the duration involved in this case, that is widely held, that provides safety of principal, and for which interest-rate data are readily available."[103] In that case, the Court concluded that the damages period for the four properties ended sometime between May 1995 and June 1996, and the opinion was issued in August 2004. Thus, the Court's choice of the 10-Year Treasury STRIPS rate was based on the roughly 10-year period between the end of the damages period and the judgment date.

84. Here, Dr. Karvel's damages period ends anywhere between May 1995 (when Rochester Square and Morningside Terrace entered Use Agreements) and April 2002 (when Waseca Properties sold the project). He assumes that judgment will be awarded in December 2005. Therefore, a prejudgment interest rate should be chosen based on a security of the appropriate duration on a property-by-property basis, ranging from less

[100] Even including the benefits of the build up in owners' equity as a result of principal payments with project revenues, it is likely that the returns were no more than 10 percent.
[101] Karvel Report, ¶ 28.
[102] Karvel Report, ¶ 28.
[103] *Independence Park*, p. 30.