**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

APACHE APARTMENTS OF
OWATONNA, *et al.*,

Plaintiffs,

**Case No. 96-700C**
**(Judge Block)**

v.

THE UNITED STATES

Defendant.

**PLAINTIFFS' PROPOSED FINDINGS**
**OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Order of December 22, 2005, and Appendix A, paragraph 14, of the Rules of the United States Court of Federal Claims, plaintiffs Apache Apartments of Owatonna, a Limited Partnership, *et al.*, hereby submit their Proposed Findings of Fact and Conclusions of Law.

# TABLE OF CONTENTS

PLAINTIFFS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW.. 1
FINDINGS OF FACT ... 1
I. THE PLAINTIFFS AND THEIR PROPERTIES. ... 1
A. The Properties. ... 1
1. Apache Apartments (Owatonna). ... 1
2. Brainerd South. ... 2
3. Eagan Gardens. ... 2
4. Hopkins Village. ... 3
5. Morningside Terrace (Winona). ... 4
6. Rochester Square. ... 4
7. Waseca Village. ... 5
II. THE SECTION 221(D)(3) AND 236 HOUSING PROGRAMS. ... 6
A. Congress Expands Housing Programs to Involve Private Enterprise. ... 6
B. HUD Carries Out its Statutory Mandate by Partnering with the Private Sector. ... 10
III. PLAINTIFFS' INVESTMENT IN THE FUTURE. ... 13
A. Formation of the Partnerships and Development of the Properties ... 13
1. Apache Apartments (Owatonna). ... 13
2. Brainerd South. ... 15
3. Eagan Gardens. ... 16
4. Hopkins Village. ... 17
5. Morningside Terrace (Winona). ... 18
6. Rochester Square. ... 19
7. Waseca Village. ... 20
8. Summary. ... 21
B. Plaintiffs' Plans and Efforts Toward Prepayment. ... 22
IV. ABROGATION OF PLAINTIFFS' PROPERTY RIGHTS. ... 23
A. Lack of Congressional Foresight Creates a Problem. ... 23
1. Congress Enacts Emergency Legislation (ELIHPA). ... 23

2. Congress' Permanent Solution: Owners Bear the Burden (LIHPRHA). .......... 25

B. Plaintiffs' "Choices" Under LIHPRHA. .......... 27

1. The Preservation Process. .......... 27

2. The Appraisal Process. .......... 29

3. Extension of Affordability Restrictions .......... 31

4. The Sale Process. .......... 32

C. The "HOPE" Act. .......... 32

V. THE IMPACT OF ELIHPA AND LIHPRHA ON PLAINTIFFS. .......... 36

A. The Statutory Restrictions Prevented the Investors from All Seven Properties from Prepaying On Their 20-Year Anniversaries. .......... 36

B. Because of Their Inability to Prepay Without Restrictions, Plaintiffs Were Compelled to Accept Worse Alternatives Under the Statutory Restrictions. .......... 38

1. The Original Statutory Restrictions Contained in ELIHPA and LIHPRHA, Combined with Plaintiffs' "Buy and Hold" Investment Strategy, Dictated That Some Plaintiffs Would Subject Themselves to Use Agreements. .......... 39

2. The Abrogation of Plaintiffs' Prepayment Rights Dictated Radical Changes to Their Strategy. .......... 40

CONCLUSIONS OF LAW .......... 45

I. PLAINTIFFS' CLAIMS ARE RIPE FOR JUDICIAL REVIEW. .......... 45

II. PLAINTIFFS SUFFERED A COMPENSABLE TAKING. .......... 47

A. Plaintiffs Had Vested Property Interests Protected By The Fifth Amendment. .......... 47

B. ELIHPA And LIHPRHA Caused A Taking Of Plaintiffs' Right To Prepay Their HUD-Insured Mortgages. .......... 47

1. The Government's Actions Had the Character of a Taking. .......... 48

2. Plaintiffs Had Reasonable Investment-Backed Expectations of Prepaying Their Mortgages. .......... 51

3. Plaintiffs Suffered a Serious Financial Loss Because of ELIHPA and LIHPRHA. .......... 55

III. PLAINTIFFS ARE ENTITLED TO JUST COMPENSATION............................59

A. Plaintiffs Are Entitled To Compensation Based On Their Lost Rental Income. ....................................................................................59

B. Plaintiffs Are Entitled to Compensation for Everything That They Have Lost.........................................................................................60

C. Plaintiffs' Damages Calculations Are Conservative And Appropriate..........................................................................................63

D. Plaintiffs Are Entitled To Interest. ..................................................65

E. Total Damages...................................................................................66

CONCLUSION ...........................................................................................67

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973).............59, 60

*Armstrong v. United States*, 364 U.S. 40 (1960) ..........................................................................47

*Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004)....................................51

*Bay-Houston Towing Co. v. United States*, 58 Fed. Cl. 462 (2003) ............................................45

*Boling v. United States*, 220 F.3d 1365 (Fed. Cir. 2000)..............................................................60

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995)...............................................................46

*Brown v. United States*, 73 F.3d 1100 (Fed. Cir. 1996)................................................................61

*Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995), *reversed on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998) ............................................................................6

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997)...........................................................13

*Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005).........................................................................48, 50, 52, 54, 55, 56, 60, 63, 64, 65

*Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001) ...........................................46

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003)...............................................................26, 47, 48, 49, 50, 51, 52, 53, 54, 55, 60

*Conant v. United States*, 12 Cl. Ct. 689 (1987) ............................................................................45

*Devon Energy v. United States*, 45 Fed. Cl. 519 (1999)..............................................................45

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ..............................................................................49

*Eyherabride v. United States*, 345 F.2d 565 (Ct. Cl. 1965).........................................................60

*Gulf Power Co. v. United States*, 998 F. Supp. 1386 (N.D. Fla. 1998), *aff'd*, 187 F.3d 1324 (11th Cir. 1999) ..........................................................................................57

*Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005) ..................................................49

*Independence Park v. United States*, 61 Fed. Cl. 692 (2004)...............................................59, 65

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)....................................................................60

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) ..............................................55, 59, 60

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984)......................................................64

*Library of Congress v. Shaw*, 478 U.S. 310 (1986)......................................................................64

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994).........................51, 54, 61

*McKart v. United States*, 395 U.S. 185 (1969) ...........................................................................45

*Narramore v. United States*, 960 F.2d 1048 (Fed. Cir. 1992) ................................................57, 58

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987).................................................................49

*NRG Co. v. United States*, 24 Cl. Ct. 51 (1991) ..........................................................................53

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ...................................................................44, 45

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)..............................................47

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).........................................................47, 49

*Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) ..............................50

*Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177 (Fed. Cir. 2004) ....................................55

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ....................................................................53

*Seaboard Air Line Ry. v. United States*, 261 U.S. 299 (1923).......................................................65

*Seiber v. United States*, 364 F.3d 1356 (Fed. Cir. 2004) ...............................................................55

*Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 (1997) ..............................................45, 56

*Tahoe-Sierra Preservation Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002)...........................................................................................................................62

*Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624 (2004) ........................65

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) ......................................53

*United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) ....................................................50, 60

*United States v. Miller*, 317 U.S. 369 (1943)..................................................................................61

*Whitney Benefits, Inc. v. United States,* 30 Fed. Cl. 411 (1994) .......... 65

*Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed. Cir. 1991) .......... 45, 57

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985) .......... 44, 45

*Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638 (Fed. Cir. 1987) .......... 59

*Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577 (Fed. Cir. 1990) .......... 59

**STATE CASES**

*Claytor v. Roanoke Redevelopment & Housing Auth., No. CL02000186-00*, 2004 WL 2085353 (Va. Cir. Ct. Jan. 30, 2004) .......... 62

**FEDERAL STATUTES**

12 U.S.C. § 1401 *et. seq* .......... 26, 61

12 U.S.C. § 1713(d) .......... 8

12 U.S.C. §§ 1715*l*, 202(a) (6) .......... 25

12 U.S.C. § 1715*l*(d)(3) .......... 7

12 U.S.C. § 1715*l*, note .......... 24

12 U.S.C. § 1715z-1 .......... 7, 8, 9

12 U.S.C. § 4101(a) (1994) .......... 26, 33, 34

12 U.S.C. §§ 4102, 4103, 4107 .......... 27

12 U.S.C. § 4103 .......... 28, 29, 30, 32

12 U.S.C. § 4106 .......... 31

12 U.S.C. § 4107(b) .......... 27, 30, 31

12 U.S.C. § 4108 .......... 27, 28

12 U.S.C. § 4109 .......... 31

12 U.S.C. § 4110 .......... 32

12 U.S.C. § 4110 ....... 29

12 U.S.C. § 4112 ....... 29, 30, 31

12 U.S.C. § 4115 ....... 31

24 C.F.R. § 221.524(a) (1970) ....... 12

24 C.F.R. § 221.529 (1970) ....... 12

24 C.F.R. § 236.309(a) (1970) ....... 12

24 C.F.R. § 248.101, *et. seq* ....... 27

24 C.F.R. § 248.105 ....... 27

24 C.F.R. § 248.111 ....... 27, 28, 29, 30

24 C.F.R. § 248.131(b) ....... 30

24 C.F.R. § 248.135 ....... 27

24 C.F.R. § 248.141(a)(1) ....... 28

24 C.F.R. § 248.145 ....... 29

24 C.F.R. § 248.157 ....... 29

24 C.F.R. § 248.201, *et. seq* ....... 27

42 U.S.C. §§ 1472(c), 1437f ....... 24

125 Cong. Rec. 18204 (1979) ....... 12

**STATE STATUTES**

Minn. Stat. § 322.01 (1932) ....... 13, 14

Minn. Stat. § 323.08 ....... 13

**MISCELLANEOUS**

Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101-625, tit. VI, 104 Stat. 4249 (1990) ....... 26

H.R. Conf. Rep. No. 100-246, 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3489....25

H.R. Conf. Rep. No. 104-384, 104th Cong.,1st Sess. at 47 (1995)....34

H.R. Rep. No. 90-1585, *reprinted in* 1968 U.S.C.C.A.N. 2873....8, 9

H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3351....23, 24, 25

H.R. Rep. No. 1585, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S.C.C.A.N. 2873, 2896....8, 9

Housing Act of 1954, Pub. L. No. 83-560, 68 Stat. 590, 601 (1954)....6

Housing Act of 1961, Pub. L. No. 87-70, tit. I, § 101(a)(6), 75 Stat. 149, 150 (1961)....7

Housing and Community Development Act of 1987, Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988)....24

Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 476, 498 (1968)....7

*Howard D. Cohen & Taylor Mattis, Prepayment Rights: Abrogation by the Low-Income Housing Preservation and Resident Homeownership Act of 1990,* 28 Real Prop. Prob. & Tr. J. 1, 33 (1993)....6

Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120 ("HOPE")....32

H.R. Conf. Rep. No. 101-943 at 461, 1990 U.S.C.C.A.N. 101st Cong., 2d Sess., at 6166....29, 30

Pub. L. No. 90-448, sec. 201(a), § 236(j)(5)(A), 82 Stat. 476....8, 9, 11, 12

Pub. L. No. 90-448, tit. II, sec. 201(a), § 236(g)....8, 9, 10

Pub. L. No. 100-242, tit. II, 101 Stat. 1877, § 261 (1988)....25

Pub. L. No. 100-242, Tit. II, 101 Stat. 1877, § 261 (1988)....61

Pub. L. No. 104-120, 110 Stat. 834....32, 33

Pub. L. No. 104-204 (H.R. 3666)....33

Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487 (1998) ....................34, 35, 61

S. Rep. No 101-316, 1990 U.S.C.C.A.N., 101st Cong., 2d Sess., v.8, 5763, 5793 .......... 26, 27; 48

S. Rep. No. 281, *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926 ....................7

# FINDINGS OF FACT

## I. THE PLAINTIFFS AND THEIR PROPERTIES.

1. Plaintiffs are owners of real estate located in Minnesota on which they operate multifamily apartment complexes. Plaintiffs are Minnesota limited partnerships created in the 1970s and 1980s for the purpose of developing and/or operating, for profit, the properties at issue.

### A. The Properties.

#### *1. Apache Apartments (Owatonna).*

2. The Apache Apartments of Owatonna property, previously owned by Apache Apartments of Owatonna, L.P., is made up of two buildings, with 11 units per building. The buildings are located at 216 & 236 12th Street NW, in Owatonna, Minnesota. The property lies on the north side of Owatonna, in a strictly residential part of town. The property is located near two parks, three schools, and is less than a mile from fire and police stations.

3. Owatonna is located 65 miles south of Minneapolis. Owatonna is the largest town in Steele County, which is a fertile agricultural region. While farming and agricultural businesses make up much of the market, Owatonna is also the home to many companies. There is a large industrial park on the western edge of town. Owatonna's major businesses include Federated Insurance, Viracon (a window manufacturer), and Cabela's (an outdoor store). Due to its proximity to the Minneapolis/St. Paul area, many Owatonna residents work in the Minneapolis metropolitan area.

4. The property itself is composed of 4 one-bedroom units, 14 two-bedroom units, and 4 three-bedroom units. The buildings are 2½-story walk-ups, constructed of

concrete and brick. Each apartment has oak cabinets, oak woodwork, oak trim, and Andersen windows. There is brick veneer on the exterior, a handicap-accessible ramp, and there are 3 handicap units in the apartments. All of these "extras" were paid for by Plaintiffs. The purpose was to ensure that the buildings were as well-built as possible, with going to market always in sight. Each building also has its own laundry, social room, and heat plants. The grounds are landscaped with a hard-surfaced parking lot. There are swing sets and a sandbox located outside.

***2. Brainerd South.***

5. Brainerd South Apartments is located at 1969-1987 South Seventh Street in Brainerd. The two buildings are garden apartments, with two stories above grade and one below. They house 60 units: 36 one-bedrooms and 24 two-bedrooms, and the apartments are only a few miles from downtown shops and other businesses.

6. Located 125 miles northwest of Minneapolis and St. Paul, Brainerd is home to a variety of businesses. Ranging from forestry, retail, and government agencies, these businesses also support the many tourism opportunities found in northern Minnesota. The local school district and regional government facilities make up the two largest employers in Brainerd.

***3. Eagan Gardens.***

7. The Eagan Gardens property is located at 4110-4130 Rahn Road in Eagan. The complex is made up of two buildings, with 144 total units: 42 one-bedroom apartments; 84 two-bedroom apartments; and 18 three-bedroom apartments. Between the two buildings, there is a two-level parking ramp for residents. The outside of the buildings is a combination

of siding and stucco. The grounds include a playground, barbeques, basketball court, and tennis court.

8. Eagan is located on the other side of the Minnesota River from Minneapolis and St. Paul, about 15 miles from each downtown. Eagan Gardens was built around the time the Highway 77 bridge was built over the river, bringing great expansion to the Eagan area. It is now a very affluent community and is home for many people who want to be close to Minneapolis and St. Paul without living in the city. The amount of available land and access to the downtowns attract many residents and developers to the city of Eagan. Many people also work in Eagan itself. There is a large industrial park and Eagan is home to large businesses such as West Publishing's corporate headquarters and Blue Cross-Blue Shield of Minnesota. Eagan Gardens is in a prime location between Interstate 35E and Highway 77, located in the heart of the suburb, near entertainment and shopping areas.

***4. Hopkins Village.***

9. The Hopkins Village apartments are located at 9 Seventh Avenue South, near Main Street in downtown Hopkins. The building has 11 floors and 161 total units: 130 one-bedrooms and 31 two-bedrooms. The first level of the building contains retail space that is leased out. One former use of the retail space was a day care facility. There is a parking lot next to the building for resident use. Also outside, there are sitting benches and a playground area. There are restaurants, shopping (both small shops on Main Street and a large mall, Ridgedale Center), a grocery store, and a park within a short distance of the building. A fire station, police station, and schools are also less than a mile away.

10. Hopkins is an inner-ring suburb and was one of the first towns settled after Minneapolis, as the rail line went from downtown Minneapolis to the west. Hopkins became

a hub in the western suburbs (it is only 15 miles out of downtown Minneapolis) and has always been a bedroom community for many people who commute to downtown Minneapolis. Due to its great access to other towns, many large grocery stores (Rainbow Foods, Super Valu, and Red Owl, when it existed) have built large grocery distribution centers in Hopkins. The largest employers in Hopkins are Super Valu and Honeywell. In addition, there has always been a large elderly population in Hopkins, and this is one need that Hopkins Village helped to meet.

***5. Morningside Terrace (Winona).***

11. Morningside Terrace is located at 1116 Sugar Loaf Road in the town of Winona. The building contains 54 units, consisting of 39 one-bedrooms and 15 two-bedrooms. There are laundry facilities on each floor, and there is a playground and gas grills outside. The apartment building sits on a hill, near Lake Winona, the Mississippi River, and Highway 14.

12. Winona is located 130 miles southeast of the Twin Cities. It is a very old town – it was settled in 1851. Winona is home to many manufacturing, retail, and agricultural businesses. It is also home to two four-year, higher-educational facilities – Winona State University and St. Mary's University. Its proximity to the Mississippi River and scenic bluffs overlooking the river provide numerous recreational activities for the residents of Winona.

***6. Rochester Square.***

13. The Rochester Square Apartments are located at 310-320 31st Street NE in Rochester. Consisting of two buildings, there are 104 total units: 12 studio apartments, 38 one-bedrooms, and 54 two-bedrooms. Each building is a 2½ story L-shaped building, with

flat roofs and cedar siding. The complex has a recreation room and each building has its own central laundry facilities. Outside, there are swings, slides, picnic tables, and gas grills.

14. Rochester is located 80 miles southeast of the Twin Cities and has experienced extensive growth in the last 20 years. Its population now exceeds 90,000, and it is the major population center in the region. There are many agricultural areas surrounding the city, but it is most famous for its large employers. Rochester is home to an IBM facility and the Mayo Medical Center. Comprised of the Mayo Clinic, St. Mary's Hospital, and Rochester Methodist Hospital, the Mayo Medical Center is a world-renowned health-care facility and Rochester's largest employer.

***7. Waseca Village.***

15. The Waseca Village apartments are made up of a single, 48-unit building. The building is located at 1301 NW 2nd Street in Waseca. The property lies on the north side of Waseca, in a residential area of town. The property is also located near the high school and shopping areas. The property itself is composed of 12 one-bedrooms, 30 two-bedrooms, and 6 three-bedrooms. The buildings are made of brick veneer and stucco siding. Like the Apache property in Owatonna (as the owners were the same), there is oak woodwork, oak trim, oak doors, and Andersen windows. Also as in Owatonna, these extras were paid for by the owners and shows their intent to go to market. There are laundry facilities, a social area, and a small office inside. Outside the building, there is a playground.

16. Waseca is located 65 miles south of Minneapolis. Waseca is home to two large industrial areas and is home to many companies for its size. Its major businesses include Brown Printing, Birdseye, and Itron (formerly E.F. Johnson). Waseca has an 82-acre park system for its residents in addition to two lakes. There are two public schools, one

parochial elementary school, a junior high, and a senior high in town. The closest larger towns are Owatonna (15 miles) and Mankato (25 miles).

## II. THE SECTION 221(D)(3) AND 236 HOUSING PROGRAMS.

### A. Congress Expands Housing Programs to Involve Private Enterprise.

17. For decades, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. *See generally*, Belden & Wiener, HOUSING IN RURAL AMERICA 114 (1999). During the 1960s, however, Congress enacted a series of housing programs designed to encourage private investors to construct, own, and manage federally assisted housing units for low- and moderate-income residents. *See Cienega Gardens v. United States*, 33 Fed. Cl. 196, 202-04 (1995), *reversed on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998). These programs encouraged individual owners, partnerships, and other entities from the private sector to develop the housing with the promise that they could end their participation in the housing programs by prepaying their Government-insured mortgage loans after twenty years, and thereafter earn conventional investment returns on their properties. *See* Howard D. Cohen & Taylor Mattis, *Prepayment Rights: Abrogation by the Low-Income Housing Preservation and Resident Homeownership Act of 1990*, 28 Real Prop. Prob. & Tr. J. 1, 33 (1993). New private owners would then take their place. (*Id.*)

18. As one of the first examples of this approach, Congress in 1961 amended the National Housing Act of 1949 to open the previously-enacted Section 221(d)(3) program[1] to

[1] The 221(d)(3) program, which provided mortgage insurance and below-market interest rate loans to owners, was created in 1954. *See* Housing Act of 1954, Pub. L. No. 83-560, 68 Stat. 590, 601 (1954). As originally enacted, however, the program was open only to non-profit organizations and public housing authorities. (*Id.*)

private investors. Housing Act of 1961, Pub. L. No. 87-70, tit. I, § 101(a)(6), 75 Stat. 149, 150 (1961) (codified as amended at 12 U.S.C. § 1715*l*(d)(3)). In expanding the 221(d)(3) program, Congress observed that the legislation would have the benefit of shifting some of the costs of the government's housing program to private industry:

> Perhaps the most significant reason that previous proposals to establish a moderate-income housing program have not been favorably received by the Congress is that the majority of those proposals *would have placed sole responsibility for such a program on the Federal Government*. The moderate-income housing program which would be provided by this bill is *designed to enable private enterprise to participate to the maximum extent* in meeting the housing needs of moderate-income families.

S. Rep. No. 281, *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926 (emphasis added); *id*. at 1926 (program broadened "to obtain maximum participation by private enterprise . . . .").

19. Congress further expanded the opportunities for private investors to participate in the government's housing programs in 1968 by enacting the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 476, 498 (1968) (codified as amended at 12 U.S.C. § 1715z-1). In passing this statute, Congress stated in its "Declaration of Policy" that in administering the programs therein, "there should be the fullest practicable utilization of the resources and capabilities of private enterprise . . . ." (*Id.* § 2; *see also id.* (finding that "there exist in the public and private sectors of the economy the resources and capabilities necessary to the full realization of" national housing policy goals).) One of the key programs created by the 1968 statute was the Section 236 program, which provided a combination of mortgage insurance and interest rate subsidies to public and private owners. (*Id.*, tit. II, § 201.)

20. In the legislative history to the 1968 statute, Congress echoed the cost-related concerns expressed in connection with the 1961 statute, finding that progress toward housing

goals "has been repeatedly interrupted by periods of tight money and budgetary pressures on the Federal Government." H.R. Rep. No. 90-1585, *reprinted in* 1968 U.S.C.C.A.N. 2873. In the same vein, Congress stated that "the bill continues the emphasis of recent years of increased reliance on private sponsorship under our housing programs and participation by private enterprises in the *financing and production* of housing." (*Id.* at 2874 (emphasis added).) Congress also noted that, while the 221(d)(3) program had been successful, it had "the limitation of depending on direct Federal lending . . . to support its 3-percent mortgages." (*Id.* at 2894.) The 236 program was designed to replace the 221(d)(3) program to an extent in order to address these financing and budgetary concerns. (*Id.* at 2873, 2894.)

21. The Section 236 program also provided other direct financial benefits to the government. First, the Government earns insurance premiums for the mortgages it insures under the program. *See generally* 12 U.S.C. § 1713(d) (authorizing collection of premiums). In addition, any rents collected from the properties that exceeded the basic rent "would be returned to the Secretary for deposit in a revolving fund for the purpose of making other interest reduction payments." H.R. Rep. No. 90-1585, *reprinted in* 1968 U.S.C.C.A.N. at 2894.[2] The statute further stated that any surplus monies from this revolving fund could be put into investments by the agency. Pub. L. No. 90-448, tit. II, sec. 201(a), § 236(g) (Codified at 12 U.S.C. § 1715z – 3(b)) ("Moneys in such fund not needed for current

---

[2] The statute also permitted properties in the program to be built with commercial space for rental, provided that the facilities would "contribute to the economic feasibility of the project." Pub. L. No. 90-448, sec. 201(a), § 236(j)(5)(A), 82 Stat. 476. The income from any such commercial facilities "would be used to reduce the cost of operating the project . . . ." H.R. Rep. No. 1585, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S.C.C.A.N. 2873, 2896.

operations may be invested in bonds or other obligations of the United States or in bonds or other obligations guaranteed as to principal and interest by the United States.").

22. The 1968 law also made mortgage insurance available to nonprofit organizations seeking to purchase a 236 project from a private owner. H.R. Rep. No. 90-1585, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S.C.C.A.N. at 2895-96. In describing this provision, Congress acknowledged that part of the incentive for private investors to enter into the Section 236 program would be the ability to liquidate the value of the asset through a sale. (*Id.* (noting that provision permitting sale of properties would be "especially useful in connection with the goal of *attracting large amounts of private-equity money* into the provision of low and moderate income housing through the establishment of national partnerships (proposed by title VIII of the bill).) It will give the limited-dividend mortgagor a ready means of disposing of his project, thereby *making his investment more liquid and attractive.*") (emphasis added).[3]

23. In furtherance of its efforts to reach out to private investors, the 1968 statute also created the "National Housing Partnerships" program. Pub. L. No. 90-448, tit. IX, § 901, 82 Stat. 476. The "Statement of Purpose" introducing this program stated:

> The Congress . . . declares that it is the policy of the United States to encourage the widest possible participation by private enterprise in the provision of housing for low or moderate income families. The Congress has therefore determined that one or more private organizations should be created to *encourage maximum participation by private investors* in programs and projects to provide low and moderate income housing.

(*Id.* (emphasis added).) This "partnership approach" to carrying out the government's housing programs was confirmed in the statute's legislative history. H.R. Rep. No. 1585,

[3] The "Title VIII" referenced in this quotation became Title IX (discussed further below) in the statute as enacted. Pub. L. No. 90-448, tit. IX, § 901.

*reprinted in* 1968 U.S.C.C.A.N. 2873, 3049 (Statement of Rep. Windall) (explaining that the program is "designed to encourage a partnership approach among interests in the private sector at the national and local level, in order to encourage low-income housing").

**B. HUD Carries Out its Statutory Mandate by Partnering with the Private Sector.**

24. The Secretary of HUD was charged with entering into contracts and issuing rules and regulations necessary to carry out the Section 236 program. Pub. L. No. 90-448, tit. II, sec. 201(a), § 236(h). Pursuant to this authority, HUD prescribed six standard contract documents to effectuate each transaction:

- A Commitment for Insurance of Advances ("HUD Commitment") issued by HUD to each owner;
- A Mortgagor's Certificate issued by each owner to HUD in response to the HUD Commitment;
- A Mortgage Note or Deed of Trust Note entered into by each plaintiff and its lender pursuant to the HUD Commitment ("Note");
- A Mortgage or Deed of Trust entered into by each owner and its private lender pursuant to the HUD Commitment ("Mortgage");
- A Regulatory Agreement entered into by each owner and HUD; and
- A Contract of Insurance entered into by HUD and each lender, evidenced by HUD's endorsement of the Note.

25. Under the Regulatory Agreement, owners were subject to numerous restrictions on the use of their properties, including (i) to construct and maintain housing in accordance with HUD specifications; (ii) to rent only to HUD-approved low-and moderate-income tenants; (iii) to charge only HUD-approved rents; and (iv) to maintain cash reserves to self-insure against mortgage default. Chief among the programs' restrictions was an investment return limitation, which provided that owners could earn no more than an annual return of six percent on their investment. Thus, owners were limited to a return of six

percent on their "initial equity investment," *i.e.*, their down payment on their properties. The amount of the permissible return remained the same over the years regardless of how much equity owners built up in their properties. Consequently, as owners continued to pay down their mortgages and the fair market value of their properties continued to rise, their annual return would represent a smaller and smaller percentage of their equity.

26. Thus, the only cash flow an owner could realize while in the program was strictly limited to this static six percent annual return.[4] This return was not guaranteed, either, as the owner was permitted to draw the funds each year only if the project finances would allow for it, creating the possibility that the owner could go years with no return.

27. The marginal annual cash flow available to owners under the program was insufficient, by itself, to induce owners to enter into either of the programs at issue. Given the length of the typical loan term under the programs, an owner would be burdened with those restrictions for forty years into the future. As a result, something more was required to attract investors into the programs.

28. Pursuant to the authority delegated to it by Congress, HUD incorporated into its contract forms a term permitting the owner to prepay its mortgage and thereby terminate its participation in the program after twenty years. This prepayment right was made explicit in the Mortgage Note executed for each property:

> The debt evidenced by this Note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner *except where*: (1) The prepayment is in

---

4 The rents paid by tenants would not go to the owner, but rather would be channeled back into the project. Furthermore, as explained above, any excess rents would be returned to HUD, whereupon the agency could use the money either to meet other financial obligations or make investments. *See* Pub. L. No. 90-448, tit. II, sec. 201(a), § 236(g), 82 Stat. 476.

> connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) The maker is a limited dividend corporation which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965*, and the prepayment occurs after the expiration of 20 years from the date of final endorsement* . . . .

*See* Note (emphasis added). The twenty-year prepayment right was also secured by the regulations governing the program, which contained a provision mirroring the contract term quoted above. (*Id.* ¶ 37; 24 C.F.R. §§ 221.524(a), 236.309(a) (1970); *see also id.* § 236.30(a)(1)(i),(ii); § 207.14 (regulation governing terms of Contract of Insurance, requiring all mortgages insured thereunder to contain a prepayment provision).)[5]

29. Thus, an owner could free itself from the program's income restrictions and requirements by exercising its right to prepay after twenty years. (*Id.*) The Regulatory Agreement provides that the programs' restrictions are binding on the owner only as long as HUD "is obligated to insure a mortgage on the mortgaged property." *See* 24 C.F.R. § 221.529 (1970). Upon prepayment, an owner could begin not only charging market rents, but actually retaining the income generated by the property (rather than being forced to funnel that income back into the property or to the Government). In this manner, the owner could finally realize the true value of its property on the open market.

---

[5] Potential tax losses may also have been attainable from the properties in the program in some instances, but any benefits attributable to those tax consequences were short-lived, since they ended with the expiration of each project's depreciation schedule. *See generally* 125 Cong. Rec. 18204 (1979). Moreover, any tax benefits devolve only to the benefit of the owners' partners, not the partnership entities themselves, which are the only parties plaintiff to this action. Thus, the tax implications of the 221(d)(3) and 236 programs provided no long-term benefit to individual partners and no benefit whatsoever to the partnerships themselves, and in fact eventually would become a major financial burden to the partners of owners unable to leave the program through prepayment.

30. As a result, the right to prepay and convert to market rents after twenty years served as a major inducement to attract owners into the program. *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 75 (1997) ("*Cienega III*"). In fact, the agency itself, in meetings with industry groups, described the prepayment right as an incentive for owners to enter into the programs.

## III. PLAINTIFFS' INVESTMENT IN THE FUTURE.

31. In the early 1970s, the owners of each of the seven properties entered into transactions with HUD and private lenders under the Section 236 program.[6]

### A. Formation of the Partnerships and Development of the Properties.

#### *1. Apache Apartments (Owatonna).*

32. In response to the HUD Commitment, the owners of Apache Apartments issued a Mortgagee's Certificate to HUD on August 2, 1971. (Pl. Tr. Ex. 003. (G_AP 00140).)

33. Apache Apartments of Owatonna, a Minnesota general partnership, was created in 1971 for the purpose of developing and operating the Apache Apartments complex. (Pl. Tr. Ex. 1 (P-AP 000572-579).) The partnership was formed pursuant to Minnesota statutory law, which defines a partnership as an association of two or more persons to carry on as co-owners a business *for profit*. *See* Minn. Stat. § 323.08, subd. 8 (1932); Minn. Stat. § 322.01 (1932); 36 Dunnell Minnesota Digest, Partnership § 2.01(e)

[6] With the exception of Apache Apartments (Owatonna) and Eagan Gardens, all of the properties were planned, developed, and owned by the plaintiffs in this case. The entity that owned Apache Apartments (Apache Apartments of Owatonna, a General Partnership), sold to plaintiff Apache Apartments of Owatonna, a Limited Partnership, in 1984. The entity that owned Eagan Gardens sold to Tonkaway Partnership, which reorganized into plaintiff Tonka Gardens LLC after 1990.

(1997) ("It is essential that the joint enterprise be for gain or profit – in other words, that there be a business enterprise."). In 1984, the general partnership sold the complex to Apache Apartments of Owatonna, a Limited Partnership.

34. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution on June 28, 1971, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $344,500. (Pl. Tr. Ex. 002, at P-AP 000101-000105.) The partnership then entered into a Mortgage and Mortgage Note with its lender on August 2, 1971, and entered into a Regulatory Agreement with HUD on August 8, 1971. (Pl. Tr. Ex. 002, at P-AP 000121-000127; Pl. Tr. Ex. 002, at P-AP 000118-000119; Pl. Tr. Ex. 004, at P-AP 000003-000017.) The Mortgage provided for a forty-year term and an interest rate of 7%. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $344,500. (*Id.*)

35. The Mortgage Note also contained the prepayment right, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. (*Id.* at P-AP 000019.) The contemporaneous regulations confirmed this prepayment right. HUD then finally endorsed the Mortgage on September 8, 1973. Thus, under the original contract documents signed among Apache, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on September 8, 1993.

36. In forming the partnership, selecting a location, and constructing the property, the original general partners were careful to ensure they would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

37. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***2. Brainerd South.***

38. Brainerd South, a Minnesota limited partnership, was created in 1971. The partnership was formed pursuant to Minnesota statutory law, which defines a partnership as an association of two or more persons to carry on as co-owners a business *for profit*.

39. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $827,300. The partnership then entered into a Mortgage and Mortgage Note with its lender on August 12, 1971, and entered into a Regulatory Agreement with HUD on the same date. The Mortgage provided for a forty-year term and an interest rate of 7%. The Mortgage made the partnership liable for the full amount borrowed of $827,300.

40. The Mortgage Note also contained the prepayment right quoted above, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD endorsed the Mortgage on October 25, 1972. Thus, under the original contract documents signed among Brainerd South, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on October 25, 1992.

41. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage

of the market value of the property immediately upon the arrival of this twenty-year anniversary.

42. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***3. Eagan Gardens.***

43. The Eagan Gardens Property was originally developed and owned by Eagan Green Apartments, a Minnesota Limited Partnership. In June of 1984, the original owners sold Eagan Green to Tonkaway Partnership, a Minnesota General Partnership. This partnership changed the property's name to Eagan Gardens and reorganized itself into Tonka Gardens LLC after 1990. The original Eagan Gardens partnership was formed pursuant to Minnesota statutory law, for the purpose of constructing and operating the project for profit.

44. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution on December 15, 1972, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $2,231,800. (Pl. Tr. Ex. 086 (FRC0910203-0910208).) The partnership also entered into a Mortgage and Mortgage Note with its lender and a Regulatory Agreement with HUD on December 26, 1972. (Pl. Tr. Ex. 087 (MIN0090111-90117); Pl. Tr. Ex. 088 (MIN00910019-910028).) The Mortgage provided for a forty-year term and an interest rate of 7%. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $2,231,800. (*Id.*)

45. The Mortgage Note also contained the prepayment right quoted above, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD then finally endorsed the Mortgage on May 30, 1974. Thus, under

the original contract documents signed among the original owners, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on May 30, 1994.

46. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

47. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***4. Hopkins Village.***

48. Hopkins Village Apartments, a Minnesota Limited Partnership, was created in 1971 for the purpose of developing and operating the Hopkins Village Apartments building. (Pl. Tr. Ex. 128 (P-AP 012201-12208).) The partnership was formed pursuant to Minnesota statutory law, for the purpose of constructing and operating the project for profit.

49. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $2,231,800. The partnership also entered into a Mortgage and Mortgage Note with its lender and a Regulatory Agreement with HUD on April 9, 1971. (Pl. Tr. Ex. 129 (P-AP 12515-12516); (Pl. Tr. Ex. 130 (P-AP 012220-12231).) The Mortgage provided for a forty-year term and an interest rate of 7%. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $2,231,800. (*Id.*)

50. The Mortgage Note also contained the prepayment right, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its

final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD endorsed the Mortgage on March 26, 1973. Thus, under the original contract documents signed among the original owners, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on March 26, 1993.

51. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

52. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***5. Morningside Terrace (Winona).***

53. Winona Properties, a Minnesota Limited Partnership, was created in 1971 for the purpose of developing and operating the Morningside Terrace Apartments building. (Pl. Tr. Ex. 286 (G_AP13538-13578).) The partnership was formed pursuant to Minnesota statutory law, for the purpose of constructing and operating the project for profit.

54. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution on August 20, 1971, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $780,900. (Pl. Tr. Ex. 289 (GP_14107-14111).) The partnership also entered into a Mortgage and Mortgage Note with its lender and a Regulatory Agreement with HUD on September 20, 1971. (Pl. Tr. Ex. 339 (P-AP 008223-8224); Pl. Tr. Ex. 340 (P-AP 008221-8222).) The Mortgage provided for a forty-

year term and an interest rate of 7%. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $780,900. (*Id.*)

55. The Mortgage Note also contained the prepayment right, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD endorsed the Mortgage on March 15, 1972. Thus, under the original contract documents signed among the original owners, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on March 15, 1992.

56. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

57. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***6. Rochester Square.***

58. Rochester Square, a Minnesota Limited Partnership, was created in 1970 for the purpose of developing and operating the Rochester Square Apartments building. The partnership was formed pursuant to Minnesota statutory law, for the purpose of constructing and operating the project for profit.

59. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $1,502,700. (Pl. Tr. Ex. 086 (FRC0910203-0910208).) The

partnership also entered into a Mortgage and Mortgage Note with its lender and a Regulatory Agreement with HUD on October 1, 1970. (Pl. Tr. Ex. 352 (P-AP 008230-8235); Pl. Tr. Ex. 349 (P-AP 008488-8489).) The Mortgage provided for a forty-year term and an interest rate of 8½ %. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $1,502,700. (*Id.*)

60. The Mortgage Note also contained the prepayment right, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD endorsed the Mortgage on December 27, 1972. Thus, under the original contract documents signed among the original owners, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on December 27, 1992.

61. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

62. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***7. Waseca Village.***

63. Waseca Village, a Minnesota Limited Partnership, was created in 1971 for the purpose of developing and operating the Morningside Terrace Apartments building. (Pl. Tr. Ex. 461 (P-AP 000501-511).) The partnership was formed pursuant to Minnesota statutory law, for the purpose of constructing and operating the project for profit.

64. HUD issued a Commitment for Insurance of Advance to the partnership and a private lending institution, pursuant to which HUD committed to endorsing for insurance a mortgage in the amount of $744,500. The partnership also entered into a Mortgage and Mortgage Note with its lender and a Regulatory Agreement with HUD on September 22, 1971. (Pl. Tr. Ex. 463 (P-AP 000464-472).) The Mortgage provided for a forty-year term and an interest rate of 7%. (*Id.*) The Mortgage made the partnership liable for the full amount borrowed of $744,500. (*Id.*)

65. The Mortgage Note also contained the prepayment right, which permitted prepayment of the Mortgage in full upon twenty years after the date that HUD provided its final endorsement of the note. The contemporaneous regulations confirmed this prepayment right. HUD endorsed the Mortgage on May 2, 1973. Thus, under the original contract documents signed among the original owners, HUD, and the private lender, the partnership acquired the right to prepay the Mortgage without HUD approval and convert to market rents on May 2, 1993.

66. In forming the partnership, selecting a location, and constructing the property, the original general partner was careful to ensure it would be in a position to take advantage of the market value of the property immediately upon the arrival of this twenty-year anniversary.

67. If the twenty-year prepayment right was not part of the original deal, the partnership would not have entered the HUD program.

***8. Summary.***

68. As mentioned above, the twenty-year period during which Plaintiffs' loans could not be prepaid commenced on the date of "final endorsement" of the Note. The final

endorsement dates, and corresponding twenty-year anniversaries, for the seven properties at issue are as follows:

| | **Date of Final Endorsement** | **Prepayment Date** |
|---|---|---|
| Apache Apartments (Owatonna) | September 8, 1973 | September 8, 1993 |
| Brainerd South Apartments | October 25, 1972 | October 25, 1992 |
| Eagan Gardens Apartments | May 30, 1974 | May 30, 1994 |
| Hopkins Village Apartments | March 26, 1973 | March 26, 1993 |
| Morningside Terrace Apartments (Winona) | March 15, 1972 | March 15, 1992 |
| Rochester Square Apartments | December 27, 1972 | December 27, 1992 |
| Waseca Village Apartments | May 2, 1973 | May 2, 1993 |

Plaintiffs always intended to prepay their mortgages and bring their rents to market levels as soon as these twenty-year dates arrived.

**B. Plaintiffs' Plans and Efforts Toward Prepayment.**

69. The partnerships secured the right to prepay after twenty years and intended from the beginning to exercise that right.

70. The plaintiffs' investment strategy, among other reasons, was a "buy and hold" approach, whereby the partnerships purchased property with the intention of holding it

for many years toward the goal of taking advantage of the appreciation in the value of the asset over time.

71. The partnerships understood that the Mortgage Note granted it the right to prepay after twenty years without HUD approval. The prepayment right was an absolutely critical term of the contracts to the partnerships.

72. In addition, the partners never would have purchased their interests in the partnerships but for the prepayment right. For those who were not in the project from the beginning, it was also understood that the original general partners would not have entered into the Section 236 program without the right to prepay after twenty years.

73. The partnerships never wavered from their plans to prepay as soon as the twenty-year anniversaries arrived.

74. The general partner of the partnerships tracked when each property could be prepaid. Over the years, the partnerships continued to track the prepayment dates meticulously, with an eye toward converting the properties to market as soon as they would be permitted to do so.

## IV. ABROGATION OF PLAINTIFFS' PROPERTY RIGHTS.

### A. Lack of Congressional Foresight Creates a Problem.

#### *1. Congress Enacts Emergency Legislation (ELIHPA).*

75. As owners like Plaintiffs neared their prepayment eligibility dates, Congress realized that many owners would exercise their contractual rights to prepay, resulting in the potential loss of hundreds of thousands of units of government-subsidized housing. H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3351 (foretelling potential loss of 500,000 to 1,000,000 rental units and concluding that there was "no simple

solution" to this "very serious problem"). To avoid this prospective loss of housing, Congress enacted legislation imposing restrictions on the ability of owners in the 221(d) (3) and 236 programs to prepay their mortgages and terminate their participation in the programs.

76. On February 5, 1988, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"). Housing and Community Development Act of 1987, Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988) (codified as amended at 12 U.S.C. § 1715*l*, note, 42 U.S.C. §§ 1472(c), 1437f). Title II of the statute, which contained the prepayment restrictions, is appropriately titled "Preservation of Low-Income Housing." (*Id.*)

77. In passing the statute, Congress made the following findings, among others:

> (i) in the next fifteen (15) years, more than 330,000 low income housing units insured or assisted under sections 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restrictions;
>
> (ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;

(*Id.* § 202(a).)

78. Based on these findings, ELIHPA imposed numerous restrictions on the prepayment of HUD-insured loans. Under ELIHPA, owners were permitted to prepay only with prior HUD approval and only in accordance with a plan of action approved by HUD. (*Id.* §§ 221(a), 225l.)

79. Thus, faced with "a most serious housing dilemma," Congress' solution was to preserve the housing that already existed, rather than bear the costs of building new housing to replace the units to be lost through the owners' exercise of their prepayment rights. *See*

H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3353 ("With the tremendous reduction in assisted housing over the last 6 years, the Committee is *determined to save what valuable resources already exist* . . . .") (emphasis added). In other words, Congress decided unilaterally to extend the "partnership" it had struck with the private sector in creating the programs. *See* H.R. Conf. Rep. No. 100-246, 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3489 (finding that "an adequate supply of low-income housing has depended and will continue to depend upon *a strong long-term partnership* between the public and private sectors . . . ."); *see also,* 12 U.S.C. §§ 1715*l*, 202(a) (6).

80. In addition, as an integral part of its preservation efforts, Congress included within ELIHPA a provision requiring all owners in the 236 and 221(d)(3) programs to provide tenants at least a one-year advance notice of any termination of a Housing Assistance Payment ("HAP") contract. Pub. L. No. 100-242, tit. II, 101 Stat. 1877, § 261 (1988). Thus, even if an owner were able to prepay its mortgage under ELIHPA, the statute provided additional tenant protections by restricting the ability of any owner who held a HAP contract to raise its rents. *See id.* This "required notice" provision was enacted in part to give the agency an opportunity to determine "whether there are additional actions that HUD might undertake to avoid the termination." (*Id.*; H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3349.)

81. HUD did not issue regulations implementing ELIHPA until September 1990, nineteen months after the statute was passed. *See* 24 C.F.R. §§ 248.201, *et. seq*. (1993).

### *2. Congress' Permanent Solution: Owners Bear the Burden (LIHPRHA).*

82. On November 28, 1990, Congress enacted the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"). Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101-625, tit. VI, 104 Stat. 4249 (1990) (codified at 12 U.S.C. §§ 4101 *et seq.*). The enactment of LIHPRHA constituted Congress's "permanent solution" to the HUD loan prepayment issue. (*Id.*)

83. LIHPRHA, by its terms, permanently abrogated the owners' right to terminate their participation in the government's housing programs after twenty years. *Id.*; *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("*Cienega VIII*"). Like ELIHPA, LIHPRHA permitted owners to prepay "only in accordance with a plan of action approved by HUD." 12 U.S.C. § 4101(a) (1994).

84. In passing LIHPRHA, Congress reiterated its concern that hundreds of thousands of housing units could be lost as a result of owners exercising their rights to prepay. S. Rep. No 101-316, 1990 U.S.C.C.A.N., 101st Cong., 2d Sess., v.8, 5763, 5793 ("The impending loss of hundreds of thousands of federally assisted housing units (under the old 221(d)(3) and 236 programs) is one of the most pressing and controversial housing issues facing the Congress."). The bulk of these prepayments were expected to be made in the years 1991 through 1995. (*Id*. (predicting "[m]ost losses occurring from 1991-1995").) Congress also reaffirmed its belief that "a *continuing partnership* between all levels of government and the private sector is essential if the nation is to resolve its affordable housing crisis." (*Id*. (emphasis added).)

85. Rather than bearing the costs of financing new housing to replace the units expected to be lost, Congress again decided to shift that burden to the owners and "preserve" the housing that already existed by restricting prepayment. (*Id.* at 5869 (referring to "preservation of the existing inventory for low-income and moderate-income use").) In choosing this course of action, Congress found that it was "*the most cost-effective strategy available to the government*" to resolve its housing problem. (*Id.* (emphasis added).)

86. LIHPRHA left untouched the provision of ELIHPA requiring owners to provide one-year notice of the termination of any HAP contract.

87. HUD did not issue regulations implementing LIHPRHA until April 1992, sixteen months after the statute was passed. *See* 24 C.F.R. §§ 248.101, *et. seq*. (1993).

**B. Plaintiffs' "Choices" Under LIHPRHA.**

***1. The Preservation Process.***

88. To request prepayment under LIHPRHA, an owner had to comply with a detailed procedure set forth in the statute and regulations. An owner first had to file a "Notice of Intent," which would be followed by a lengthy appraisal process, which in turn would be followed by the submission of a detailed "Plan of Action." 12 U.S.C. §§ 4102, 4103, 4107; 24 C.F.R. §§ 248.105, 248.111, 248.135. The Plan of Action was required to contain significantly detailed information about the project and its market, demanding a great commitment of time and expense on the part of owners. 12 U.S.C. § 4107(b).

89. The options available to an owner seeking to prepay were, of course, defined and limited by the terms of the statute and regulations, as dictated by Congress and enforced by the agency.

90. Under LIHPRHA, an owner could prepay without restrictions only in very narrow circumstances. In particular, the agency had to make the following findings, among others, in order to approve a request to prepay and terminate the affordability restrictions on the property:

> (a)(1) [I]mplementation of the plan of action will not –
>
> > (A) materially increase economic hardship for current tenants, and will not in any event result in . . . an increase in the monthly rental payment in any year that exceeds 10 percent . . . ; or
> >
> > (B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
>
> (2) The supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect –
>
> > (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve . . . .

12 U.S.C. § 4108; *see also* 24 C.F.R. § 248.141(a) (1).

91. The record contains no evidence of any owner in the 221(d)(3) or 236 program being permitted to prepay without restrictions under these criteria. In addition, the Minneapolis office of HUD, which has jurisdiction over all HUD properties in Minnesota, has no knowledge or record of any property in the state being able to satisfy the stringent requirements for prepaying without restrictions.

92. An owner unable to meet the requirements for prepaying without restrictions had two other "choices" under LIHPRHA: (1) accept certain "incentives" determined by the agency and agree to remain in the program for another fifty years (*i.e.*, "extend"), or (2) attempt to sell the property to a non-profit organization or government body at a price

determined through procedures mandated by HUD (*i.e.*, "transfer"). 12 U.S.C. §§ 4110, 4112; 24 C.F.R. §§ 248.145, 248.157.

***2. The Appraisal Process.***

93. After receiving a notice of intent requesting to either extend or transfer, the agency and owner are required to embark on an appraisal process dictated by the agency's regulations. 12 U.S.C. § 4103; *see also* 24 C.F.R. § 248.111. The government and the owner must each obtain, and pay for, an appraisal of the property. 12 U.S.C. § 4103(a)(1),(c). If the parties are unable to agree on a value, a third appraiser must be retained, whose conclusion as to value "shall be binding." (*Id.; see also* H.R. Conf. Rep. No. 101-943 at 461, 1990 U.S.C.C.A.N. 101st Cong., 2d Sess., at 6166 (noting that the statute "adopts the 3 appraiser approach currently used under the Farmers Home prepayment provisions").)

94. In conducting the appraisals, the appraisers are required to "measure the 'as-is' value of the property rather than the potential value of the property after repairs and rehabilitation." HUD Notice H 92-54 at 13 (7/21/92) ("HUD Notice"). To accomplish this, the appraisers must determine the value of any rehabilitation and conversion costs that they believe would be required in order to obtain market rents. 12 U.S.C. § 4103(c)(1).

95. At the same time, the agency is required to prepare a "Preservation Capital Needs Assessment" ("PCNA") setting forth its estimate of any repairs it believes are required to be made. HUD Notice at 12; *see* 12 U.S.C. § 4103(c). The agency's guidelines attempt to avoid any redundancy between the appraisers' rehabilitation cost estimate and the PCNA, but acknowledge that there is "possible duplication" between the two. HUD Notice at 15.

96. The statutorily-mandated appraisal process contains other notable departures from standard valuation practices. For example, in determining the "extension preservation value" (to be used in connection with a request to extend the affordability restrictions), the appraiser is prohibited from determining the "highest and best use" independently, and must assume that the property will be used as market-rate rental housing. 12 U.S.C. § 4103(c)(1); 24 C.F.R. § 248.111(f). In addition, in estimating project expenses, the appraiser is required to "use the *greater of* actual project operating expenses . . . or projected operating expenses after conversion in determining preservation value." 12 U.S.C. § 4103(c); 24 C.F.R. § 248.111(e) (emphasis added); *see also* H.R. Conf. Rep. No. 101-943 at 462, 1990 U.S.C.C.A.N., 101st Cong., 2d Sess., at 6167 (noting the "unique nature" of the "preservation appraisals" required by the statute).

97. The ultimate conclusion of the appraisal process is a determination of the "preservation value" of the property (*i.e.*, the value determined through the agency's preservation process) as opposed to the "fair market value" of the property. 12 U.S.C. § 4103(b).

98. The appraisal process alone can take up to eight months. 24 C.F.R. § 248.111(j). At the conclusion of the process, and within nine months after the submission of the owner's notice of intent, HUD is required to forward to the owner various information it will need to prepare its plan of action. 24 C.F.R. § 248.131(b). The owner then must prepare and submit its plan of action to either extend affordability restrictions or offer to sell the property to a non-profit buyer. 12 U.S.C. § 4107.

### *3. Extension of Affordability Restrictions*

99. If the owner submits a plan of action to extend the affordability restrictions on the property, it must commit to preserving the property as affordable housing for its remaining useful life, which is to last a minimum of fifty years. 12 U.S.C. § 4112(a)(2)-(A)(c). In order to obtain such a commitment, HUD is authorized to provide the owner certain "incentives" defined by the statute. 12 U.S.C. § 4109. One "incentive" available is an "equity loan," which permits the owner to take out a second mortgage against the property by borrowing a portion of the equity in the property as determined by the agency. 12 U.S.C. § 4109(b)(7). The owner's obligations are typically set forth in a Use Agreement signed by the owner and HUD.

100. The incentives available to an owner under LIHPRHA differ from those provided by ELIHPA. While a Use Agreement under ELIHPA extends for twenty years, a Use Agreement under LIHPRHA must continue for a minimum of fifty years. In addition, while an owner proceeding under ELIHPA is able to collect some rental income – albeit at rates well below the market – an owner proceeding under LIHPRHA must continue to abide by investment return limitations.

101. The owner's plan of action to extend affordability restrictions must be submitted within six months after its receipt of information from the agency under 12 U.S.C. § 4106, *i.e.*, within fifteen months after the filing of the owner's notice of intent. 12 U.S.C. § 4107(a)(1). The agency then has up to a year to decide whether to approve or reject the plan of action. 12 U.S.C. § 4115. Thus, the statutory time frame from the owner's submission of a notice of intent through the agency's decision on a plan of action can extend up to twenty-seven months. That time frame can also be extended for various reasons. Indeed, the statute

accommodates delays in the process by permitting a plan of action to be approved based on an appraisal that is up to thirty months old. 12 U.S.C. § 4103(k).

***4. The Sale Process.***

102. If an owner opts to sell the property to a non-profit organization, it must first submit a plan of action requesting to do so. 12 U.S.C. § 4110. The owner then is required to put the property up for sale at the "preservation transfer value" previously determined through the agency's appraisal process. (*Id.*) The property must remain for sale for up to fifteen months. 12 U.S.C. § 4110(b),(c). Qualified purchasers are entitled to attempt to negotiate a lower price, but the sale price cannot in any event exceed the agency's preservation value. (*Id.* § 4110(b)(1).)

103. The owner is entitled to prepay if no qualified purchaser comes forward. (*Id.* § 4114.) However, the agency is authorized to offer various forms of assistance to a qualified purchaser, thereby increasing the likelihood that a sale will be consummated and the owner will lose its property. (*Id.* § 4110(d).)

104. Empirical evidence shows that many more owners pursue plans of action to extend affordability rather than running the gamut of the agency's sale process. The evidence also suggests that, in practice, the sale process takes an even longer time to complete than the extension process.

**C. The "HOPE" Act.**

105. On March 28, 1996, the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120 ("HOPE") was signed into law. While the Government asserts that section 2(b) of that statute restored the right to prepay to all 236 and 221(d)(3) owners, subject only to a sixty-day rent freeze, the HOPE Act makes no reference to prepayment at

all. *See* Pub. L. No. 104-120, 110 Stat. 834. Rather, the relevant subsection, which is titled "Low-Income Housing Preservation," deals with the spending authority of the Secretary of HUD. (*Id.*) In particular, the subsection provides that certain specified categories of funding that are "provided for use in conjunction with properties that are eligible for assistance" under ELIHPA or LIHPRHA can only be used by the Secretary under the "authority and conditions provided in" a certain "undesignated paragraph" of a referenced bill that was previously passed by the House. (*Id.*)[7] As a result, the impact of HOPE was set forth only as a limitation on the funding available for the agency's preservation programs.

106. The only direct indication of a statutory restoration of the right to prepay came later, in an appropriations bill for fiscal year 1997 that was passed on September 26, 1996. Title II of the "Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1997" contains an undesignated subsection titled "Preserving Existing Housing Investment," which appropriates $5,750,000,000 to HUD for, among other things, "revitalizing, rehabilitating, preserving, and protecting" low-income housing developments. Pub. L. No. 104-204 (H.R. 3666), Title II, 110 Stat. 2874, 2884. This appropriation is subject to nineteen provisos, one of which states as follows:

> **Provided further**, That an owner of eligible low-income housing may prepay the mortgage or request voluntary termination of a mortgage insurance contract, so long as said owner agrees not to raise rents for sixty days after such prepayment.

(*Id.* (emphasis added).)

---

[7] That bill, H.R. 2099 (104th Congress), was vetoed by President Clinton and never passed into law. *See* 141 Cong. Rec. H.15061 (daily ed. Dec. 18, 1995); 1995 U.S.C.C.A.N., 104th Cong., 1st Sess., vol. 2, at [73-74]; 1996 U.S.C.C.A.N., 104th Cong., 2d Sess., vol. 6, at [493].

107. This language is codified only in the Historical and Statutory Notes to 12 U.S.C. § 4101, with a citation to the above-quoted act of September 26, 1996, *not* the earlier enacted HOPE. *See* 12 U.S.C. § 4101, note (2001) (note titled "Funding for Properties Eligible for Assistance Under LIHPRHA or ELIHPA") (citing Pub. L. 104-204, Title II, Sept. 26, 1996, 110 Stat. 2883). In fact, the statutes and regulations concerning prepayment nowhere make any reference to the HOPE statute. *See* 12 U.S.C. § 4101 *et seq.* (2001); 24 C.F.R. Pt. 248.[8]

108. Thus, HOPE did not explicitly address, let alone restore, the prepayment rights of HUD owners. Nor did HOPE actually repeal ELIHPA or LIHPRHA. While agency officials in certain HUD regional offices permitted some owners to prepay under HOPE, the statutory history shows that the prepayment restrictions imposed by ELIHPA and LIHPRHA were not expressly lifted by HOPE or by the subsequent September 1996 statute. Indeed, the statutes and regulations restricting prepayment remain on the books to this day, in the same form that they existed prior to HOPE. *See* 12 U.S.C. § 4101 *et seq.* (2001); 24 C.F.R. Part 248 (2004).

109. As a result, confusion remained among the agency and the industry as to the status of the owners' prepayment rights. *New Law Clarifies Prepayment Rights, Changes Renewal Contract Terms*, Assisted Housing Financial Management Insider, Mar./Apr. 1999, at 7. That uncertainty extended to the HUD Minneapolis office, which continued to inform

[8] There is no legislative history to explain HOPE's purpose or effect. *See* 1996 U.S.C.C.A.N., 104th Cong., 2d Sess., vol. 4, at 605-606 (indicating no legislative history for Pub. L. No. 104-120); *see also* 1996 U.S.C.C.A.N., 104th Cong., 2d Sess., vol. 6, at [482]. The legislative history upon which the Government relies, H.R. Conf. Rep. No. 104-384, 104th Cong.,1st Sess. at 47 (1995), does not appear in the legislative history to either HOPE or the subsequent September 26, 1996 statute that actually referenced prepayment.

certain owners that prepayment without restrictions still was not permitted, even after the passage of HOPE. Officials in Minneapolis felt compelled to seek clarification from HUD headquarters in Washington, D.C. in response to any attempts by owners in Minnesota to prepay under HOPE.

110. The confusion surrounding owner's prepayment rights remained at least until October 21, 1998, when Congress included in a fiscal year 1999 appropriations bill a section titled "Clarification of Owner's Right to Prepay." Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487 (1998). That law stated that, notwithstanding the existing statutes restricting prepayment, owners "may prepay, and the mortgagee may accept prepayment of, the mortgage on the project." (*Id.* § 219(a).) Even under the 1998 clarifying law, however, the right to prepay was conditioned on a new 150-day notice period prior to prepayment, followed by a sixty-day rent freeze after prepayment. (*Id.* § 219(b).)

111. Finally, consistent with the fact that HOPE did not repeal either ELIHPA or LIHPRHA, the one-year notice requirement set forth in ELIHPA for terminating any HAP contract was left untouched by HOPE. As a result, even for those owners who were permitted by the agency to prepay after the passage of HOPE, they remained unable to raise rents or exclude tenants until the expiration of any existing HAP contracts. In fact, the agency touted the continuing HAP contract protections as an important preservation measure that survived the passage of HOPE. In addition, for an owner whose HAP contract would expire in less than a year after HOPE passed, the owner would be unable to provide notice of termination in sufficient time to meet the one-year requirement.

## V. THE IMPACT OF ELIHPA AND LIHPRHA ON PLAINTIFFS.

112. After planning for approximately fifteen (15) years, the plaintiffs began making serious preparations for prepayment in the late 1980s. These preparations involved, among other things, contacting local agency officials such as Mr. Howard Goldman (Director, Multifamily Housing Division, Minneapolis HUD office) and Mr. Mark Campbell (HUD's Branch Chief, Loan Management). These contacts involved the prerequisites for prepayment, including preparation for the timely expiration of any HAP contracts that might possibly interfere with prepayments scheduled for the properties' 20-year anniversaries.

### A. The Statutory Restrictions Prevented the Investors from All Seven Properties from Prepaying On Their 20-Year Anniversaries.

113. Acutely aware of the significance of their prepayment dates, representatives of each plaintiff began participating in a series of meetings and telephone conferences with local HUD officials in the early 1990s.

114. Plaintiffs quickly learned from the local HUD office that the prepayment prohibitions they learned about had become permanent. During their meetings and conversations with local agency officials, Plaintiffs were informed that, pursuant to various statutes, none of the partnerships would be permitted to prepay pursuant to their original expectations. The local HUD representatives informed the partnerships that there was nothing they could do to alter the legislative changes.

115. Pursuant to their prepayment preparations, Plaintiffs whose properties were encumbered by HAP contracts were prepared to permit those contracts to expire before their 20-year anniversary in order to permit prepayments to occur in a timely fashion. Those Plaintiffs had discussed specific plans to allow the HAP contracts to expire before their

respective 20-year anniversaries as part of the partnerships' long-term prepayment strategy. After learning that they would not be permitted to prepay without restrictions as they planned, however, some Plaintiffs decided to renew their HAP contracts in the early 1990s . Five-year extensions were standard at that time.

116. Despite Plaintiffs' understanding that the statutory regime from 1988 through 1991 abrogated their prepayment rights and that they would not be able to prepay in any event pursuant to the statutes themselves, Plaintiffs nonetheless repeatedly attempted to prepay. There were numerous meetings between Plaintiffs, their partners, their representatives, and local agencies. The partnerships explored each and every statutory alternative that might permit them to prepay. As part of this effort, Plaintiffs consulted with various attorneys and some ultimately retained attorneys specializing in affordable housing matters.

117. During this process of exploring prepayment options, the agency confirmed that the partnerships were not eligible for any form of prepayment pursuant to the statutes. Plaintiffs simply would not be able to satisfy one of the major prerequisites for such a prepayment, *i.e.*, that tenants would not be displaced upon prepayment. Indeed, given that all of the partnerships would have raised rents by substantially more than 10% if permitted to prepay, it was a foregone conclusion that none of the plaintiffs could meet the stringent requirements for prepayment.

118. In the end, the agency expressly determined that prepaying without restrictions was not a possibility for the partnerships under any circumstances, and it so informed them.

119. The partnerships, however, would not take "no" for an answer. Despite the agency's determination that Plaintiffs were not eligible for an unrestricted prepayment, the

partnerships' representatives continued to explore ways to prepay. Ultimately, however, the agency informed the partnerships that, given the legislative restrictions, it would be futile for them even to file for prepayment. Accordingly, as a result of their extensive dealings with the agency and its determination that it would be futile for them even to attempt to prepay, plaintiffs were foreclosed from filing any Notice of Intent requesting to prepay and exit the program.

**B. Because of Their Inability to Prepay Without Restrictions, Certain Plaintiffs Were Compelled to Accept Worse Alternatives Under the Statutory Restrictions.**

120. Following the agency's determination that Plaintiffs were not eligible to prepay without restrictions, the partnerships' representatives took stock of their situations. They determined that, because of the statutory restrictions, they had no remaining viable alternatives. The very existence of the partnerships was premised upon the goal of "buying and holding" for the long-term, and recovering those profits available to them by doing so. None of the "alternatives" available under the statutory restrictions, however, would permit them to do so. These "alternatives" available to Plaintiffs under the statutory restrictions were particularly unpalatable given the original agreement to prepay without restrictions. Thus, the partnerships did not face a business decision. They simply did what the statutes compelled them to do.

121. Moreover, the consequences of preventing the partnerships from prepayment were far-reaching. Given the "alternatives" available to Plaintiffs under the statutory restrictions, these consequences could extend well beyond the original twenty-year period, thereby leading to complications directly caused by the statutes themselves. These

consequences, and the statutory "alternatives" available to Plaintiffs from which they flowed, were not a matter of choice or free will; rather, they were dictated by statutory mandates.

***1. The Original Statutory Restrictions Contained in ELIHPA and LIHPRHA, Combined with Plaintiffs' "Buy and Hold" Investment Strategy, Dictated That Some Plaintiffs Would Subject Themselves to Use Agreements.***

122. Pursuant to the statutory restrictions imposed by LIHPRHA, Plaintiffs basically faced two "alternatives": (1) transfer their properties to non-profit organizations at a price determined by agency procedures,[10] or (2) retain ownership of their properties within the restrictions of the Section 236 Program and obtain some form of "incentive" to help afford them to do so.

123. Given the long-term investment goal of "buy and hold" that was so intrinsic to each partnership, the "choice" was dictated by the statutes themselves. Clearly, the partnerships' original business strategies would not permit all of them to "choose" the alternative at item no. 1 above (*i.e.*, property transfers).

124. Instead, the Rochester and Winona partnerships were compelled to subject themselves to item no. 2 above as the only other viable "alternative" that was dictated by the statutes, *i.e.*, retain property ownership pursuant to a "Use Agreement" combined with some form of financial "incentive."

---

[10] Plaintiffs were familiar with the appraisal guidelines and understood that they were promulgated by HUD.

### *2. The Abrogation of Plaintiffs' Prepayment Rights Dictated Radical Changes to Their Strategy.*

#### *a. Apache Apartments (Owatonna).*

125. Even though Apache Apartments was not subjected to a Use Agreement, it took years before the agency finally permitted the owner to accomplish its goal of getting out of the HUD program as soon as possible.

126. In the 1980s, Paul Arnfelt and the other general partners sold 90% of their investment in the project to ten limited partners. Arnfelt and his partners planned that when the prepayment date came around on September 8, 1993, 50% of the assets would go to the general partners and the limited partners would get 50%. In addition, the limited partners owed the general partners $145,000 apiece in cash upon prepayment. This was an attractive investment for the limited partners because the prepayment option had increasing tangible value as the prepayment date drew closer.

127. When Arnfelt and the rest of the partners learned that the Government had changed the rules, interest owed by the limited partners began accruing, adding to the expenses from 1992-1995. The limited partners even threatened to sue the general partners for the Government's actions.

128. When the law changed, the partners had to restructure their deal. The limited partners wanted to get out of the deal because of the elimination of the prepayment right.

129. Throughout this time period, Arnfelt and the partners communicated with HUD between 15 and 20 times per year about their situation, but were repeatedly told that they could not prepay.

130. Even after the passage of HOPE in 1996, the agency continued to inform the partnership that it would not be permitted, under the existing law, to prepay and exit the program. The agency's position remained unchanged until 1999, after Congress passed legislation in late 1998 clarifying the right of owners to prepay.

131. Thereafter, the partnership made every effort to prepay as soon as possible. After complying with the lengthy notice requirements mandated by the 1998 statute and other procedures, the property finally got out of the HUD program on January 4, 2000, six and one-half years after the owners should have been allowed to prepay the Mortgage.

***b. Brainerd South.***

132. Tim Murray and the other owners of the Brainerd South property always referred to their "freedom date" – the date when they would be able to prepay. The 20-year prepayment right was the reason they entered the contract from the start. When they found out that the laws had changed, they pleaded with Minneapolis HUD employees to let them out under the terms of their agreement. They were told numerous times that they would not be able to get out.

133. After these meetings, the owners educated themselves about the law. They wanted to get their money out, but they did not want to sell. They also did not want to be partners with the Government any longer, as they were afraid the Government would change the rules again in the future.

134. In the end, the partnership decided that selling was the only viable way to get out of the program. They began a very long sale process a year before the HOPE statute was passed. They finalized a "preservation sale" to the Brainerd Housing Authority in 1996 at a price well below the true fair market value of the property.

***c. Eagan Gardens.***

135. When the partnership purchased Eagan Gardens (then called Eagan Green), the property was subject to HAP contracts. Knowing that they wanted to prepay when the conversion date would come up in May 1994, Robert Thimmesh and the other partners let the HAP contracts lapse.

136. When the law changed in the late 1980s, the owners attempted to make prepayments upon their 20-year anniversary. Fannie Mae kept payment until the agencies worked out what the rules would actually be. After significant delay, Mr. Thimmesh's money was returned. This type of confusion over how to operate after passage of ELIHPA and LIHPRHA was common.

137. During this time, there were also meetings throughout the country by property owners to study and evaluate the new legislation. Upon learning of the possibility a restoration of the prepayment right, the Eagan Gardens owners again tried to prepay. Again, they were denied. After significant paperwork and agency delay, however, the owners were finally able to get out of the HUD program on September 4, 1996.

***d. Hopkins Village.***

138. In Hopkins, Jeff Hagen and his family wanted to prepay the Mortgage and go to market rent when the conversion date arrived on March 26, 1993. They spent extensive time in meetings and planning to achieve their goal.

139. When the Hagens learned about the change in law, they retained legal counsel who specialized in helping property owners evaluate their options under ELIHPA and LIHPRHA. Even after hiring legal counsel and spending thousands of dollars on fees, the

Hagens and their lawyers were stymied by government agencies that were unsure how to navigate the process.

140. The Hagens, through their representatives, made every effort to find a way to prepay and convert their property to market. Even after the passage of HOPE in 1996, the agency continued to inform the partnership that it would not be permitted, under the existing law, to prepay and exit the program. The agency's position remained unchanged until 1999, after Congress passed legislation in late 1998 clarifying the right of owners to prepay.

141. By that time, however, the partnership had already begun the process of selling the property to a non-profit organization. In addition, while trying to navigate the new requirements imposed by the 1998 statute, the Hagens found themselves in the middle of a potential lawsuit over their attempt to prepay the Mortgage. The Hagens, who had developed much of Hopkins and had built a strong reputation in the community, suddenly found themselves besieged by media inquiries and vilified by tenant organizations. The Hagens found this spotlight extremely distasteful, and on March 24, 1999, they sold their property to a non-profit agency at a price well below the true market value of the property.

***e. Morningside Terrace (Winona).***

142. The Morningside Terrace conversion date came up on December 27, 1992. The owners were upset to learn that they would not be able to prepay their mortgage, as they had always intended to do. Over the next four years, the partnership tried to operate within the strictures of ELIHPA and LIHPRHA. Ultimately, the partners concluded that those statutes gave them no real options for exiting the HUD programs, so they agreed to perpetuate their participation by signing a Use Agreement, on May 17, 1995.

143. At the time they signed the Use Agreement, the owners were not aware that HOPE would be passed the following year. At the time, in May 1995, the Use Agreement was deemed the only viable option for the partnership. Now, they are committed to the program until early 2013.

***f. Rochester Square.***

144. Rochester Square is owned by the same partnership as Morningside Terrace, and they met the same fate with the Rochester property. When the property's conversion date of March 15, 1992, came and went, it eventually became clear to the owners that they had no hope of escaping the HUD programs under the ELIHPA/LIHPRHA regime. They therefore decided to sign a Use Agreement on May 17, 1995, almost a year before HOPE's enactment in March 1996. This Use Agreement locks the partners into HUD's low-income housing program until early 2012.

***g. Waseca Village.***

145. Not surprisingly, because Waseca Village was owned by the same people that owned Owatonna, they had the same experience. The owners were originally eligible to prepay for this property on May 2, 1993. The owners made continual efforts to prepay, but were repeatedly informed by the agency – even after the passage of HOPE – that prepayment simply was not an option. The agency's position remained unchanged until 1999, after Congress passed legislation in late 1998 clarifying the right of owners to prepay.

146. By that time, however, the partnership had already begun the process of selling the property to a non-profit organization. In addition, various requirements imposed by HUD caused severe delays in the completion of the sale. The sale was finally completed on April 10, 2002, at a price well below the true fair market value of the property.

## CONCLUSIONS OF LAW

### I. PLAINTIFFS' CLAIMS ARE RIPE FOR JUDICIAL REVIEW.

147. A taking claim is ripe once the property owner obtains a final decision applying the challenged statute or regulation to the property at issue. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985); s*ee also Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001) (holding that a taking claim is ripe "once . . . the permissible uses of the property are known to a reasonable degree of certainty"). To determine if an agency decision is final, courts look only to whether the "initial decision-maker" has reached a conclusion regarding the requested use of the property. *Williamson County*, 473 U.S. at 193. *Accord Devon Energy v. United States*, 45 Fed. Cl. 519, 529 (1999); s*ee also Bay-Houston Towing Co. v. United States*, 58 Fed. Cl. 462, 472 (2003) (holding that a takings claim is ripe "where it is plain that the **requested land use** will not be permitted") (emphasis added).

148. An owner need not obtain a final agency decision in order to ripen its takings claim where it would be futile to do so. *Palazzolo*, 533 U.S. at 620; *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997) (holding that a claim is ripe when there is "no question" as to how the regulations apply to the property). Thus, the futility exception is met if the agency has no discretion under the applicable regulatory regime to permit the owner's desired use of the property. *Suitum*, 520 U.S. at 739 ("Because the agency has no discretion to exercise over Suitum's right to use her land, no occasion exists for applying Williamson

County's requirement that a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel.”).[11]

149. The Federal Circuit has already applied these principles to the very facts now before the Court. In *Cienega VI*, the Federal Circuit held that the taking claims like those here were ripe based on evidence that HUD had no discretion to permit the owners to prepay without restrictions. *Cienega Gardens v. United States*, 265 F.3d 1237, 1243, 1248 (Fed. Cir. 2001) (“*Cienega VI*”). Applying the statutory requirements for an owner to terminate its participation in the programs, the court relied on the owners’ evidence that: (1) they would have raised rents by at least ten percent if permitted to prepay (which constitutes a material increase in economic hardship for tenants); and (2) prepayment would materially affect the supply of low-income housing in the relevant communities. (*Id.* at 1248.)

150. In this case, all the plaintiffs tried to prepay without restrictions, and were denied by the agency. Moreover, all of the plaintiffs would have raised their rents by much more than 10% if permitted to prepay. In other words, none of the plaintiffs were able to satisfy the narrow statutory requirements for prepayment without restrictions. So even if the plaintiffs did not, in all instances, obtain a final decision from the agency, it would have been futile for them to attempt to prepay without restrictions.

---

[11] As a result, courts can determine whether the futility exception applies simply by applying the relevant statutory mandates to the facts. *See Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171-1172 (Fed. Cir. 1991) (claim ripe where plaintiff proved that statute precluded desired use and circumstances did not fall within statutory exception); *id*. at 1173 (plaintiffs could establish a taking “if they could try on the shoe and it fit -- *i.e.*, by proving at trial that their interests lay within the boundaries of the prohibition.”); *Conant v. United States*, 12 Cl. Ct. 689, 692 (1987); *see also McKart v. United States*, 395 U.S. 185 (1969) (no need for exhaustion where facts clearly fit statutory definition).

## II. PLAINTIFFS SUFFERED A COMPENSABLE TAKING.

### A. Plaintiffs Had Vested Property Interests Protected By The Fifth Amendment.

151. To analyze a takings claim, the Court "must first determine what was taken." *Branch v. United States*, 69 F.3d 1571, 1757 (Fed. Cir. 1995). Here, there is no question that Plaintiffs possessed property rights protected by the Fifth Amendment. The Federal Circuit has already resolved this question in the nearly identical case of *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"). There, the court considered similar participants in low-income housing programs under sections 221(d)(3) and 236 of the National Housing Act. The court held that participants in these programs held at least two sources of property rights that were protected by the Fifth Amendment: (1) the fee simple ownership of the land upon which their apartment complexes were built; and (2) contract rights derived from the Mortgage Notes and other contracts signed as part of the Plaintiffs' entrance into the programs. (*Id.* at 1329-30.) The court held that these interests vested when the Plaintiffs signed the contracts, and therefore were protected by the Fifth Amendment when ELIHPA and LIHPRHA were enacted. (*Id.* at 1330.) These aspects of *Cienega* are indistinguishable from the present case. Plaintiffs had the same ownership and contract rights as the *Cienega* plaintiffs, which are protected by the Fifth Amendment.

### B. ELIHPA And LIHPRHA Caused A Taking Of Plaintiffs' Right To Prepay Their HUD-Insured Mortgages.

152. After identifying the relevant property interests, the Court must determine whether the Government's actions constitute a compensable taking under the Fifth Amendment. Regulatory actions like ELIHPA and LIHPRHA constitute a taking when government interference with private property goes "too far." *Pennsylvania Coal Co. v.*

*Mahon*, 260 U.S. 393, 415 (1922); *Cienega VIII*, 331 F.3d at 1336-37. A telltale sign of when regulation has gone too far is when the Government forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). To make this determination, the Court must evaluate three factors: (1) the character of the Government's action; (2) its interference with the owner's reasonable investment-backed expectations; and (3) its economic impact. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *Cienega VIII*, 331 F.3d at 1337. Analysis of these three factors confirms that Plaintiffs suffered a taking because of ELIHPA and LIHPRHA and that they are entitled to just compensation.

***1. The Government's Actions Had the Character of a Taking.***

153. The Federal Circuit has examined what the Government concedes are "identical circumstances" in the related *Cienega Gardens* case, and concluded that the Government's enactment of ELIHPA and LIHPRHA, as applied to a plaintiff's right to prepayment, "had a character that supports a holding of a compensable taking." (*See* Def. Mot. for Summary Judgment at 20.) The facts of this case show with equal force that Plaintiffs suffered a compensable taking.

154. Determining the character of the Government's action means more than just examining the Government's purpose or policy reasons. *See Cienega VIII*, 331 F.3d at 1340. The Court must also look at the means by which the Government tried to accomplish its purpose, and specifically whether the Government placed the disproportionate burden of its policy on a small segment of society instead of spreading the burden over a large portion of the population. (*Id.* at 1338-40.)

155. During the many years that Plaintiffs participated in the Government's low-income housing programs, the Government did not develop sufficient replacement housing or otherwise provide for the possibility that Plaintiffs would exercise their unilateral right to prepay their mortgage and terminate their participation in the HUD programs. Faced with a potentially disastrous shortage of low-income housing, Congress enacted ELIHPA and LIHPRHA to "extend the availability of low-income housing" through the § 221(d)(3) and § 236 programs. *Cienega Gardens v. United States*, 67 Fed. Cl. 434, 466 (Fed. Cl. 2005) ("*Cienega IX*"). Congress determined that preserving low-income housing in this way was less expensive than funding new Section 8 housing or other options. *See Cienega IX*, 67 Fed. Cl. at 467; S. Rep. No. 101-316, at 107 (1990), *reprinted in* U.S.C.C.A.N. 5763, 5869.

156. Congress has the power to make policy choices such as this, but it cannot foist the burdens of these choices on Plaintiffs without just compensation. *See Pennsylvania Coal*, 260 U.S. at 416 (1922) ("[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."); *Cienega VIII*, 331 F.3d at 1340 ("The disproportionate imposition on the Owners of the public's burden . . . is not rendered any more acceptable by the worthiness of purpose."); *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 448-49 (2005) (holding that public interest did not justify the government's attempt to avoid paying just compensation). Nor can Congress place the burden of maintaining the low-income housing supply upon Plaintiffs, who did not contribute to the nation's shortage of low-income housing. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 838 (1987) (holding that imposing an easement as a condition of issuing a construction permit constituted a taking because the easement's purpose was not reasonably related to any public need or burden to

which the Plaintiffs contributed); *Dolan v. City of Tigard*, 512 U.S. 374, 392-95 (1994) (holding that city must compensate landowner for imposition of an easement on her property for a public greenway, where landowner's proposed development did not encroach on existing greenway space in the city).

157. The Federal Circuit has already held that the force and effect of ELIHPA and LIHPRHA caused a taking, because the statutes are akin to a "physical invasion." *See Cienega IX*, 331 F.3d at 1338. Like the owners in *Cienega*, the Government eliminated Plaintiffs' right to prepay and created a holdover tenancy. *See id.* Once ELIHPA and LIHPRHA eliminated Plaintiffs' prepayment rights, Plaintiffs were forced to remain in the program and continue leasing only to government-approved tenants, and Plaintiffs were forbidden from converting their properties to other uses. Although the Government provided certain economic incentives for owners upon terminating the right to prepay, such incentives do not alter the fact that "HUD effectively rented apartment buildings from the Owners beyond the term of the agreed leasehold and then sublet apartments to low-income tenants." (*Id.*) Courts have established that this kind of physical invasion demands just compensation for property owners. *See, e.g.*, *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986).

158. Here, ELIHPA and LIHPRHA clearly have the character of a taking. As the Federal Circuit concluded in *Cienega VIII:*

> Congress' objective in passing ELIHPA and LIHPRHA – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking. That is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden.

331 F.3d at 1338-39.

### *2. Plaintiffs Had Reasonable Investment-Backed Expectations of Prepaying Their Mortgages.*

159. The second prong of the Court's takings analysis is to determine whether the statutes interfered with the owners' distinct, reasonable investment-backed expectation. This inquiry "begins with the Plaintiffs' actual expectations, then delves into whether they were objectively reasonable." *Cienega IX*, 67 Fed. Cl. at 471. Plaintiffs entered the section 236 and 221(d)(3) programs specifically because they could prepay their mortgages and exit the programs after 20 years. The Government made explicit promises and Plaintiffs made their investment decisions in reliance on these promises. The Government broke its promises by enacting ELIHPA and LIHPRHA, which frustrated Plaintiffs reasonable investment-backed expectations. Plaintiffs "bought their property in reliance on a state of affairs that did not include the challenged regulatory regime" of ELIHPA and LIHPRHA, and therefore are entitled to compensation. *See Cienega VIII*, 331 F.3d at 1346 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994), *abrogated on other grounds*, *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004)).

160. The "critical question" here, as in *Cienega*, is "whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government to nullify the twentieth-year prepayment right in the mortgage contract and in the regulations." *Cienega VIII*, 331 F.3d at 1346. As in *Cienega*, the evidence establishes that Plaintiffs could not have reasonably expected any such thing.

161. In this case, Plaintiffs always intended to prepay, and indeed the promise of prepayment was the very "quid pro quo" for Plaintiffs to enter the HUD programs. During

the time that Plaintiffs were required to stay in the programs, they were subjected to severe restrictions on the amount of income that they could earn from their properties. The principal reason that Plaintiffs entered the programs was the promise that, on a certain date, they could prepay the Mortgages and begin charging market rents for their properties. Like the owners in *Cienega*, Plaintiffs "did not expect cancellation of their primary incentive or the nullification of their long-term plan." *Cienega VIII*, 331 F.3d at 1347.

162. Plaintiffs' intent to prepay is made clear by the properties themselves. Because the owners' goal was to exit the HUD programs after twenty years and begin charging market-rate rents, the properties needed to be commensurate with non-subsidized properties, and they were. Each of the owners built well-constructed properties in economically-sound neighborhoods with good prospects for strong appreciation. The properties were well-maintained, with capital improvements made regularly.

163. Like the similarly-situated owners in *Cienega*, Plaintiffs here "are the type of landowners who bought their property and entered into contracts in reliance on a different regulatory regime." *Cienega VIII*, 331 F.3d at 1347. Indeed, given the relative incentives – virtually no profit while owning and operating the properties for twenty years, in exchange for the promise of being able to realize the true market value of their properties upon prepayment – Plaintiffs' "very participation in the program . . . signifies their understanding that their option to exit the housing programs at twenty years would remain in effect." (*Id.*)

164. Plaintiffs' belief that they would be able to prepay their mortgages were also eminently reasonable, for at least two reasons: (1) the government explicitly promised that owners would be able to prepay; and (2) the right to prepay was crucial to the projects' economic success.

165. First, the Government explicitly promised that Plaintiffs would be able to prepay after twenty years, and this promise was a material inducement for Plaintiffs to participate in the HUD programs. *See Cienega VIII*, 331 F.3d at 1348. Not only did the government make this promise, but it was expressly echoed by contemporaneous federal regulations. *See Cienega IX*, 67 Fed. Cl. at 473 (citing historical federal regulations). Although the regulations were subject to change, the Federal Circuit has held that the mere fact that regulations may be amended "does not mean that program participants are reasonably on notice for *every possible change*, and therefore could not have had a reasonable investment-backed expectation of no change to the prepayment right." *Cienega VIII*, 331 F.3d at 1348 (emphasis added).

166. Courts have similarly rejected the notion that by entering a sector that is highly regulated, plaintiffs abandon all claims to reasonable investment-backed expectations regarding the particular regulatory scheme. For example, in *Ruckelshaus v. Monsanto Co.,* a pesticide manufacturer brought a takings claim based upon the Environmental Protection Agency's disclosure of trade secret information submitted to the agency pursuant to a federal pesticide statute, even though the statute contained "explicit assurances" that such information would remain confidential. 467 U.S. 986, 1011 (1984). The court held that even though the pesticide industry is subject to "significant government regulation," the statute's "explicit governmental guarantee formed the basis of a reasonable investment-backed expectation." (*Id.* at 1008, 1011.) Accordingly, the plaintiff was entitled to just compensation. *See also United Nuclear Corp. v. United States*, 912 F.2d 1432, 1436 (Fed. Cir. 1990) (holding that company making significant investments in heavily-regulated industry was entitled to just compensation when fundamental regulations under which

investments were made were changed); *NRG Co. v. United States*, 24 Cl. Ct. 51, 62 (1991) (holding that it "certainly was not reasonably foreseeable at the time [certain] permits were signed that the government would enact legislation canceling them").

167. Here, the Government's explicit guarantee that property owners would be able to prepay their mortgages formed the basis of a reasonable investment backed expectation. As the Federal Circuit recognized in *Cienega*, some changes to a regulatory scheme could not reasonably be expected, and "[a]brogating the prepayment right was such an unexpected change." *Cienega VIII*, 331 F.3d at 1348. "It was reasonable for the Model Plaintiffs to have expected the twentieth-year prepayment right to remain unchanged because it was a material inducement to the Model Plaintiffs signing the mortgage contracts and Regulatory Agreements . . . ." (*Id.)*

168. Plaintiffs' prepayment right was also a critical economic aspect of the transactions. Without that right, the transactions would not have been economically feasible for Plaintiffs. The Federal Circuit correctly noted that, because the regulations set a specific duration for participation in the program, "the prepayment right would be a significant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property." *Cienega VIII*, 331 F.3d at 1349. Therefore, it would be reasonable for an owner to expect that the prepayment right would remain – as the Government promised it would – and that Plaintiffs would make their investment decisions accordingly. Common sense and the prior analysis of the Federal Circuit and this Court demonstrate that Plaintiffs' investment-backed expectations and reliance on the prepayment right were reasonable.

### 3. *Plaintiffs Suffered a Serious Financial Loss Because of ELIHPA and LIHPRHA.*

169. Under the final prong of the *Penn Central* analysis, the Court will find a taking if Plaintiffs suffered a "serious financial loss from the regulatory imposition." *Loveladies Harbor*, 28 F.3d at 1177. Here, each of the owners suffered severe financial losses due to ELIHPA and LIHPRHA. The appropriate way to measure losses caused by ELIHPA and LIHPRHA was accurately described in the nearly-identical circumstances of the *Cienega* case. In *Cienega IX*, Judge Lettow of this Court drew upon the Federal Circuit's earlier rulings to hold that the proper way to measure economic impact is to measure Plaintiffs' return on equity against what they would have received but for the taking. *Cienega IX*, 67 Fed. Cl. at 474 (citing *Penn Central*, 438 U.S. at 129). *See Cienega VIII*, 331 F.3d at 1342-43 (applying the return-on-equity approach to determine severity of economic impact); *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188-89 (Fed. Cir. 2004) (stating that return-on-equity approach is the appropriate method for determining economic impact of a regulation on a going business concern); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1,7 (1949) (noting that "the proper measure of compensation is the rental that probably could have been obtained").

170. The Government contends that the appropriate measure of economic harm is the overall diminution in value of the properties. This argument should be rejected, just as it was by both the Federal Circuit and this Court in the *Cienega* litigation. *See Cienega VIII*, 331 F.3d at 1344-45; *Cienega IX*, 67 Fed. Cl. at 476. The fatal flaw in the Government's method is that it does not specifically measure the economic impact of a temporary taking during the time that the taking *actually occurred*. *See Seiber v. United States*, 364 F.3d

1356, 1371 (Fed. Cir. 2004) (noting that economic impact of a temporary taking should be assessed over the period of the taking).

171. This problem is compounded where, as here, the affected property generates income. When taken property is income-generating, owners not only lose the value of the property, they also lose income that would otherwise have been generated during the time of the taking. Thus, measuring an owner's return on equity better demonstrates the economic impact on a temporarily taken income-generating property than measuring the change in fair market value under two hypothetical scenarios.

172. The Government's approach simply does not properly measure the economic impact to the lost stream of income in this case. *See, e.g., Cienega IX*, 67 Fed. Cl. at 476. As the Court noted in *Cienega IX*, if a federal agency took 100% of an owner's $10 million annual income for four-and-one-half years on a $100 million property, the Government would argue that it only took 45% in expected returns. (*Id.*) To accept the Government's approach would be to eliminate the owner's claim for the cumulative loss of $45 million, which was caused solely by the Government's actions. Thus, the Government's approach is unsound as a matter of economics because it does not account for the plaintiffs' lost income during the period of the taking. This approach is also problematic for policy reasons because it would allow the Government to avoid takings liability even in cases where it completely destroys the use of property for a limited period of time. Such a result flies in the face of the Constitution and of sound economics.

173. The Government also argues that Plaintiffs' losses were mitigated by so-called "incentives" that the Government provided under ELIHPA and LIHPRHA. As the Court held, these statutory options are irrelevant to the economic impact prong, and to the Court's

determination of whether a taking exists. *See Cienega IX*, 67 Fed. Cl. at 470-71. If the Court were to accept the Government's argument, then Congress could evade the duty to pay just compensation for any taking, simply by establishing a statutory option under which it would provide some lesser value to the owners. *See id.* at 470; *Suitum v. Tahoe Reg. Planning Agency*, 520 U.S. 725, 747 (1997) (Scalia, J., concurring) ("If money that the government-regulator gives to the landowner can be counted on the question of whether there is a taking . . . , rather than on the question of whether the compensation for the taking is adequate, the government can get away with paying much less.").

174. The Federal Circuit rejected a similar Government argument in *Whitney Benefits, Inc. v. United States*, holding that statutory compensation schemes such as those provided by ELIHPA and LIHPRHA are optional for claimants pursuing takings claims. The court held that such schemes are simply "a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act . . . ." *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1175 (Fed. Cir. 1991). The court added that "[t]o hold that mere presence of an exchange provision precludes a court from finding a taking on enactment in cases like this one would eviscerate the constitutional just compensation guarantee." (*Id.* at 1176.)

175. Accepting the Government's argument would also mean that Congress, not the courts, would determine whether a taking occurred and what the level of compensation would be. This cannot be allowed because, as one court related, "a fox cannot be charged with guarding the hen house." *Gulf Power Co. v. United States*, 998 F. Supp. 1386, 1396 (N.D. Fla. 1998), *aff'd*, 187 F.3d 1324 (11th Cir. 1999). Indeed, the Federal Circuit has

reiterated that once a taking has been made, it is the "judicial branch [that] fixes the amount of just compensation – 'the price of the taking.'" *Narramore v. United States*, 960 F.2d 1048, 1050 (Fed. Cir. 1992).

176. Clearly-settled precedent shows that plaintiffs here were not obligated to accept any of the purported statutory "incentives" that Congress offered when it abrogated their rights through ELIHPA and LIHPRHA, and those alternatives cannot in any way be used to offset the severe economic impact of the Government's actions in this case.

177. No amount of "incentives" can change the fact that ELIHPA and LIHPRHA caused a taking of the Plaintiffs' property, and that they are entitled to compensation. Likewise, there is no question that the Plaintiffs suffered severe economic harm due to these takings. This is vividly demonstrated by the return-on-equity calculations performed by plaintiffs' expert, Dr. George Karvel. His calculations show that plaintiffs realized paltry returns on their equity, which were near or far below one percent:

| **Property** | **Return on Equity as of Prepayment Date** | **Return on Equity as of Termination Date** |
|---|---|---|
| Apache Apartments | 0.98 % | 0.63 % |
| Brainerd South | 0.56 % | 0.45 % |
| Eagan Gardens | 0.66 % | 0.59 % |
| Hopkins Village | 0.41 % | 0.31 % |
| Waseca | 1.24 % | 0.60 % |
| Morningside | 0.80 % | 1.45 % |
| Rochester Square | 0.52 % | 1.00 % |
| **AVERAGE RETURN** | **0.74 %** | **0.72 %** |

(First Amended Expert Report of George R. Karvel, Ph.D. ("Karvel Rep.") Add. D.)

178. Comparing these returns to the plaintiffs' cost of equity, it is clear that plaintiffs suffered severe diminutions in their expected return during the relevant time

periods. Compared to the expected rate of 12%, which Dr. Karvel estimates to be the low end of the scale, the properties suffered diminutions at the following levels:

| **Property** | **Diminution of Return / Economic Impact as of Prepayment Date** | **Diminution of Return / Economic Impact as of Termination Date** |
|---|---|---|
| Apache Apartments | 91.9 % | 94.7 % |
| Brainerd South | 95.4 % | 96.2 % |
| Eagan Gardens | 94.5 % | 95.1 % |
| Hopkins Village | 96.6 % | 97.4 % |
| Waseca | 89.7 % | 95.0 % |
| Morningside | 93.4 % | 87.9 % |
| Rochester Square | 95.7 % | 91.7 % |
| **AVERAGE DIMINUTION** | **93.9 %** | **94.0 %** |

(*See id.*)

179. Looking at these numbers, there is no question that Plaintiffs suffered a severe economic impact from the Government's takings.

## III. PLAINTIFFS ARE ENTITLED TO JUST COMPENSATION.

### A. Plaintiffs Are Entitled To Compensation Based On Their Lost Rental Income.

180. In cases involving temporary takings, courts typically award damages based on the rental income that the property owner lost. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 8 (1949); *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990). Plaintiffs here should therefore receive damages based on the rental income that they lost when the Government abrogated their rights to prepay on the twenty-year anniversaries. *See, e.g.*, *Independence Park v. United States*, 61 Fed. Cl. 692, 707 (2004) (holding that "any market price that one may attempt to estimate in determining the just compensation for plaintiffs' loss must take the plaintiffs' foregone rent increases into account").

**B. Plaintiffs Are Entitled to Compensation for Everything That They Have Lost.**

181. The Just Compensation Clause of the Fifth Amendment is designed to put a property owner "in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973); *Yuba Natural Resources, Inc. v. United States*, 821 F.2d 638, 640 (Fed. Cir. 1987). Generally, when the property taken "is of a type for which there is not an easily identifiable market or determination of a fair market value cannot be readily made, courts may look to other available sources to determine what measure of compensation would most accurately compensate the plaintiff." *Independence Park*, 61 Fed. Cl. at 707. Here, Plaintiffs seek damages sufficient to make them whole, and this encompasses several components.

182. First, the Government took more than Plaintiffs' contractual right to prepay. As the Federal Circuit held in *Cienega VIII* and this Court recognized in *Cienega IX*, plaintiffs' interests here encompass their *real property* interests. *Cienega VIII*, 331 F.3d at 1328-30; *Cienega IX*, 67 Fed. Cl. at 480. A critical component of Plaintiffs' real property interests is the right to exclude others. *See Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *Cienega VIII*, 331 F.3d at 1336 & n.30; *Cienega IX*, 67 Fed. Cl. at 469. Thus, even assuming that HOPE restored the "right to prepay," Plaintiffs continued to incur damages under the Fifth Amendment until their full property rights were restored, and they finally were placed "in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973).

183. Second, courts have routinely recognized that owners are entitled to additional components of damage in cases that, like this one, involve temporary takings. *See Kimball Laundry Co.*, 338 U.S. at 15-16 ("going concern" value of business recoverable); *United States v. General Motors Corp.*, 323 U.S. 373, 382-83 (1945) (removal and relocation expenses awarded for temporary taking of leasehold); *Boling v. United States,* 220 F.3d 1365, 1373 n.5 (Fed. Cir. 2000). In *Eyherabride v. United States*, 345 F.2d 565 (Ct. Cl. 1965), for example, the court held that recovery for a temporary taking included "the cost of placing the property in its pre-taking condition (if it has diminished in value)." (*Id.* at 570.) Here, Plaintiffs' properties will not realize their "pre-taking" condition until the end of the damage period determined by Plaintiffs' experts.

184. The end of the damage period does not coincide with the enactment of HOPE. The Federal Circuit has held that just compensation is required from the "date the taking occurs until the date of the regulation's rescission or amendment." *Loveladies Harbor*, 28 F.3d at 1177. HOPE did not rescind, repeal, or amend ELIHPA or LIHPRHA. Even after HOPE passed, HUD and the industry remained confused about the conflicting laws on the books. *See, e.g.*, 12 U.S.C. § 1401 *et. seq.* (2001); 24 C.F.R. Part 248 (2004). That uncertainty was not resolved until 1998, when Congress finally passed a "clarification" of the owners' right to prepay. *See* Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487 (1998). Even that statute contained onerous notice requirements and continued other preexisting restrictions. *See id.* § 219(b). For example, both HOPE and the later "clarification" statute left many of the restrictions imposed by ELIHPA and LIHPRHA untouched, including the one-year notice requirement for termination of HAP contracts and the availability of tenant lawsuits. *See* Pub. L. No. 100-242, Tit. II, 101 Stat. 1877, § 261 (1988). Thus, there is no

statutory basis for concluding that the enactment of HOPE triggered the end of Plaintiffs' damages claims.

185. Finally, Plaintiffs are entitled to damages under the well-established principle of severance damages. That theory recognizes that when the government takes less than the owner's entire interest in property, the owner is entitled to any damages caused to the portion of the property not taken. *See United States v. Miller*, 317 U.S. 369, 375-376 (1943); *Brown v. United States*, 73 F.3d 1100, 1105 n.5 (Fed. Cir. 1996). Further, the Supreme Court has explained that temporary takings are no different in kind from other types of partial takings – *i.e.*, situations where the government takes less than the entire property interest owned by the plaintiff:

186. An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest. Both dimensions must be considered if the interest is to be viewed in its entirety. *Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 331-332 (2002) (internal quotations omitted); *see also Claytor v. Roanoke Redevelopment & Housing Auth.*, No. CL02000186-00, 2004 WL 2085353 (Va. Cir. Ct. Jan. 30, 2004) (holding that severance damages in a temporary takings case includes "lost rental income during the temporary taking period *plus* any decrease in the fair market value" remaining at the end) (emphasis added). Thus, the doctrine of severance damages applies in this case and entitles plaintiffs to compensation not only for their losses during the Government's taking, but also for the losses they continue to suffer thereafter, until they are made whole.

187. In sum, Plaintiffs are entitled to compensation for all of the damages they suffered as a result of ELIHPA and LIHPRHA. Those damages continued until Plaintiffs finally were able to free themselves of all Government's restrictions on the use of their properties. That did not occur, or will not occur, until the time that each plaintiff either: (1) prepaid its mortgage in full and was freed from any continuing restrictions on the use of the property, (2) sold the property based on its true fair market value, or (3) reached the termination of any Use Agreement imposed as part of the agency's preservation program.

**C. Plaintiffs' Damages Calculations Are Conservative And Appropriate.**

188. Plaintiffs' damage calculations estimate the profits that each plaintiff lost because of the Government's taking. These claims are conservative, reasonable, and fair.

189. Plaintiffs' damages expert, Dr. George Karvel, employed the well-recognized "discounted cash flow" ("DCF") approach to damages, which is commonly used to value losses from income-producing properties over extended periods of time. Dr. Karvel's damages model calculates a fair and reasonable estimate of the present value of each property's total lost cash flow, before tax, caused by ELIHPA and/or LIHPRHA. Each of Dr. Karvel's key assumptions – income projections, discount rates, mortgage rates, operating expenses, and others – were intentionally made conservatively. For example:

- **Income Projections**: To project the market-rate rents that Plaintiffs could achieve upon prepayment, Dr. Karvel utilized the rents described as achievable by appraisals, or rents actually charged by the owners after being permitted to prepay. Dr. Karvel also employed a conservative 2.5% rate of increase for income for each property, and an industry-standard vacancy rate of 5%. (Karvel Rep. at 5.)

- **Discount Rates**: Dr. Karvel used a present value factor of 10% for cash flows attributable to the actual period of the taking. Even though the risks inherent in participation in the Government's housing programs are greater than the risks of operating multi-family housing on the open market, Dr.

Karvel conservatively applied this 10% rate to the cash flows calculated in both the market scenario and the restricted scenario. This assumption is particularly conservative in light of the fact that many of the plaintiffs did not receive even the meager annual returns to which they are entitled while in the program.

- **<u>Interest Rates</u>**: Dr. Karvel then ran two different analyses to bring the damages from the end of the taking period up to the date of judgment. First, he applied a conservative rate of 6.37% based on the ten-year STRIPS rates for the relevant time period. *See Cienega XI*, 67 Fed. Cl. at 490-91. Next, he applied a 10% rate based on a conservative estimate of Plaintiffs' expected returns as real estate investors. (Karvel Rep. at 7-8.)

- **<u>Mortgage Rates</u>:** Dr. Karvel assumed that Plaintiffs, if permitted to prepay on their intended prepayment dates, would have taken out 30-year, fixed rate mortgages at prevailing market rates applicable to their types of property. The projected interest rates for these conventional mortgages were calculated from a database obtained from the American Council of Life Insurers. (*Id.* at 9.)

- **<u>Operating Expenses</u>**: Dr. Karvel assumed that, upon conversion to a conventional, market-rate property, plaintiffs' operating expenses would remain at the same level as other comparable, market-rate properties located in the same region of the country. (*Id.* at 6.) He also applied a conservative 2.5% rate of increase for all expenses – the same rate applied to calculate increases in income.

190. Dr. Karvel's model is even more conservative when measured by what it *does not* include as damages:

- Dr. Karvel assumed that any conventional mortgages taken to prepay the HUD-guaranteed loans would be taken only for the remaining balance of that loan. But in reality, Plaintiffs' properties had appreciated significantly, which would have enabled them to take out substantial amounts of equity from their properties. (*See id.* at 13.)

- Dr. Karvel's model does not consider that, upon prepayment, some plaintiffs could have sold their properties at a premium to willing buyers in arms-length transactions or converted their properties to other, more profitable uses, such as conversion to condominiums. Instead, Dr. Karvel conservatively assumed only that the properties would achieve market rents by completing improvements identified in the appraisals. (*See id.* at 13-14.)

191. These examples show that Plaintiffs' damage model is based on conservative assumptions. When Dr. Karvel made decisions affecting the market-rent scenario, he erred on the side of minimizing damages. When he made decisions affecting the restricted-rent scenario, he gave the benefit of the doubt to the Government. Plaintiffs' model yields reliable, verified, and conservative estimates of plaintiffs' damages.

**D. Plaintiffs Are Entitled To Interest.**

192. "Owners of property taken by the government are entitled to interest from the date the taking became effective until paid by the government." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984). If the Government delays paying owners just compensation until after the taking, the Constitution requires that the government pay interest. *Library of Congress v. Shaw*, 478 U.S. 310, 317 n.5 (1986); *Cienega IX*, 67 Fed. Cl. at 492. In this case, the Government did not compensate Plaintiffs when their property rights were taken, so Plaintiffs must receive interest "to place them 'in as good a position pecuniarily' as they would have been without the taking." *Cienega IX*, 67 Fed. Cl. at 492 (quoting *Kirby Forest*, 467 U.S. at 10).

193. The Court should select an interest rate that gives Plaintiffs the "full and perfect equivalent of the property taken." *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 306 (1923). To achieve this goal, courts apply the "prudent investor rule," which looks to how a reasonably prudent person would have invested the funds to "produce a reasonable return while maintaining safety of principal." *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004). Under this rule, courts apply market-based measures such as corporate bond rates to determine an appropriate interest rate. (*Id.* at 628.) Here, Dr. Karvel applied a conservative interest rate of 6.37% in his damages model based

on ten-year treasury yields, and an alternative rate of 10% reflecting his view of plaintiffs' actual likely investment returns.

194. Plaintiffs are also entitled to compound interest. Compound interest is necessary in this case to "accomplish complete justice" under the Constitution. *Cienega IX*, 67 Fed. Cl. at 493 (quoting *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985)). Here, as in *Cienega IX*, Plaintiffs must be awarded compound interest because they "would have reinvested the money in some manner had the government paid them at the end of the taking." (*Id.*) Compounding is simply a routine method by which a reasonable person would protect his or her investment over an extended period of time. (*Id.*) *See also Independence Park,* 61 Fed. Cl. at 717; *Whitney Benefits, Inc. v. United States,* 30 Fed. Cl. 411, 415 (1994). As the Court held in *Cienega IX*, given "the use to which plaintiffs could have put their award, and that some of the takings ended . . . years ago," compound interest is appropriate for the plaintiffs here. (*Id.*)

**E. Total Damages.**

195. Based on the conservative analysis discussed above, Plaintiffs are entitled to the following damages for each property:

| **Property** | **Damages Under 6.37% Interest Rate** | **Damages Under 10% Interest Rate** |
|---|---|---|
| Apache Apartments | $158,224 | $200,082 |
| Brainerd South | $887,577 | $1,265,104 |
| Eagan Garden | $640,129 | $913,917 |
| Hopkins Village | $6,914,475 | $8,919,868 |
| Morningside | $636,325 | $636,325 |

| | | |
|---|---|---|
| Rochester Square | $1,921,666 | $1,921,666 |
| Waseca | $334,587 | $392,088 |

**CONCLUSION**

For the reasons set forth above, Plaintiffs seek judgment in their favor on their claims for just compensation under the Fifth Amendment and an award of damages based on the damages calculations presented by their expert witnesses.

Respectfully submitted,

**s/ Jeff H. Eckland**
JEFF H. ECKLAND
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
500 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 236-0160
Facsimile: (612) 236-0179

Jerry W. Snider, Of Counsel
William L. Roberts, Of Counsel
Michael Cockson, Of Counsel
Mark D. Savin, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Plaintiffs*

Dated: March 28, 2006

M2:20783965.10