IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| APACHE APARTMENT OF OWATONA, ET AL., | ) | |
| Plaintiffs, | ) | No. 96-700C (Judge Block) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's December 22, 2005 order, defendant, the United States, proposes the following findings of fact and conclusions of law:

PROPOSED FINDINGS OF FACT

1. National housing policy began in the New Deal era with the passage of the National Housing Act ("NHA") of 1934 and the United States Housing Act of 1937.

2. Initially the Federal Government sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local public housing authorities. During the 1960s, the Federal Government shifted its focus by enacting legislation to encourage the construction, ownership, and management of low- and moderate-income housing by private owners. Specifically, Congress amended the National Housing Act in 1961 by establishing the section 221(d)(3) program, 12 U.S.C. § 1715l(d)(3), allowing the Federal Housing Administration (which

was subsumed in the newly-created Department of Housing and Urban Development ("HUD"), in 1965) to provide mortgage insurance and below-market interest rate loans to private owners.

3. In 1968, Congress amended the NHA again, establishing the "section 236" program, 12 U.S.C. § 1715z-1, which allowed HUD to provide mortgage insurance and interest rate subsidies to private owners.

4. Owners accepting a Government-insured loan pursuant to the "section 221(d)(3)" and section 236 programs were subject to HUD regulations governing the use of their properties so long as they remained in the program. They were restricted as to the distribution of their income, the rents and other fees they could charge, and their methods of operation. 24 C.F.R. §§ 221.510(c), 236.10(c) (1970).

5. Owners were also limited to a six percent dividend on their initial equity investment in the project. 24 C.F.R. §§ 221.531(b), 221.532(a), and 236.50(a), (b) (1970).

6. Congress designed the HUD low income housing programs with lucrative and immediate benefits to entice developers and investors into participating in the programs. Congress built the low income housing programs upon the assumption that the tax benefits were the primary economic motivation for developers and builders to build low income housing.

7. Pursuant to these programs, developers could borrow

90 percent of the overall cost of the project in a HUD-insured loan. This offered developers greater leverage than a comparable conventional loan. The developers were also entitled to a Builder's and Sponsor's Risk Premium and Allowance ("BSPRA"). When credited against the cost of the project, the developer's initial cash investment dropped to one to three percent of the purchase price.

8. Developers typically structured the section 221(d)(3) and 236 investments as limited partnerships to effectuate "pass through" tax treatment of the entities' losses, because the Federal Government does not tax partnerships as entities; rather, each individual partner claims their equity portion of the partnership's income and losses. Properties in the 236 and 221(d)(3) programs were also entitled to use accelerated depreciation. Accelerated depreciation ensured that program properties would record large paper losses throughout the properties' initial years.

9. Accelerated depreciation and high leverage caused the HUD properties to produce tax losses. Then, the partnerships upstreamed their losses to the partners, to offset profits from other investments.

10. Developers and initial investors could take advantage of the tax benefits in two different ways. If they had income from other sources, they could keep their interest in the

properties and use the tax benefits to reduce their own tax burdens. Alternatively, they could sell interests in the properties through syndication or direct sales to private investors. Either approach allowed the developers and investors to immediately monetize the value in the expected tax benefits. At the end of the syndication process, the original investors had already made a significant profit on the deal.

11. A tax shelter is an investment in which a material component of the return is derived from the ability to shelter unrelated income with net tax deductions or credits. When combined with the high leverage of the 236 and 221(d)(3) deals, the properties became extremely attractive tax shelters for high-income individuals.

12. When developers syndicated or directly sold low-income housing shares to limited partners, the limited partners were attracted because of the tax benefits. Through syndication, developers typically expected to obtain a cash profit, while retaining an equity interest.

13. When developers kept the tax benefits for their own use, they recouped their initial investment in one or two years, depending upon their tax bracket, by sheltering their outside income. Investors that purchased shares in the deal through the syndication, anticipated a similar return on their investment.

14. Because the HUD-insured loans were non-recourse, the

developer never had more at risk than the amount of money actually invested in the project - the developers' other assets were out of reach to potential creditors. Developers expected to obtain continuing profits from regular dividends and by selling services, such as property management, to the building. These incentives made investment in the programs very low risk - if not risk free - for the developers. As a result, developers participated in low-income housing without considering any potential residual value to be a material incentive. The residual value included an opportunity to prepay the mortgage after 20 years and leave the program.

15. Under the program, the properties paid expected dividends set at .6 percent of the project's total value. Because of the low initial cash investment for the developer, this provided a generous, double digit return on investment. Given the typical actual initial investment, the dividend could actually provided a return in excess of 25 percent per annum.

16. As the developers knew at the time they built the apartments, the residual value would ultimately depend upon interest rates, property values, the renters' market, and other variables existing 20 or more years in the future that were indiscernible at the time of development.

17. Investors in low-income housing were interested primarily in the investment's tax losses, and, secondarily, in

receipt of regular dividend payments from the property. Because tax benefits generated a sufficient return to attract investors, limited partners invested in section 221(d)(3) and 236 projects without regard to the opportunity to prepay the HUD-insured mortgage. The only material expectation actually backed with an investment was the lucrative tax benefit.

18. Plaintiffs own land in or near Minneapolis, Minnesota, on which rental housing complexes were constructed in the early 1970s.

19. Some plaintiffs entered into transactions with HUD and private lenders in accordance with section 236 of the NHA, as amended, pursuant to which their properties were built and operated as low-income housing under the section 236 program; others entered the Federal housing program after their properties were developed.

20. At the time they entered the Federal housing program, plaintiffs were aware that tax benefits would inure to them from entering the Federal housing program.

21. In the late 1980s, Congress became concerned that a large number of owners might utilize their prepayment opportunities, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. As a result, Congress enacted two pieces of legislation to meet an anticipated crisis

in the availability of low-income housing.

22. In 1987, Congress passed the Emergency Low Income Housing Preservation Act ("ELIHPA"), which took effect on February 5, 1988. Pub. L. 100-242, 101 Stat. 1877 (reprinted as amended at 12 U.S.C.A. § 17151 (note) (West 1989)). ELIHPA instituted a permit process under which plaintiffs were required to seek approval to prepay their HUD-insured mortgages. Id. In the alternative, Congress provided a series of financial incentives. Id. These included (1) increasing allowable distribution, (2) revising the method of calculating equity, (3) increasing access to residual receipts accounts or excess replacement reserves, (4) insurance for a second mortgage under Section 241(f) of the NHA, (5) increasing rents on existing "Section 8" contracts, and (6) financing for capital improvements.

23. In 1990, Congress replaced ELIHPA with the Low Income Housing Preservation and Resident Ownership Act of 1990 ("LIHPRHA"), 12 U.S.C. § 4101 et seq.

24. The 20th anniversary of HUD's final endorsement of each plaintiff's mortgage note occurred after the enactment of ELIPHA.

25. The purpose of Government actions pursuant to LIHPRHA was to preserve the supply of low-income housing.

26. To the extent that plaintiffs intended to exit the Federal housing program immediately upon the 20th anniversary of

the final endorsement of the mortgage notes, they contributed to the low-income housing shortage that Congress addressed in enacting LIHPRHA.

27. LIHPRHA provided a comprehensive framework by which owners could obtain compensation, exit the HUD programs entirely, or prepay their HUD-insured mortgage. LIHPRHA asserted HUD's regulatory jurisdiction over prepayment and required owners to seek approval to prepay. 12 U.S.C. § 4102. Pursuant to 12 U.S.C. § 4101(a), HUD could approve prepayment either pursuant to 12 U.S.C. § 4108 or 12 U.S.C. § 4114.

28. To obtain any of these options, LIHPRHA required owners to file notices of intent, conduct appraisals of their property, and then submit plans of action within various statutory time frames. Owners were able to submit their first notices of intent as early as two years prior to their original prepayment date and, thus, possessed the ability to reduce any (or avoid entirely) administrative delays after their prepayment eligibility date. 12 U.S.C. §§ 4102; 4119(1)(B). Owners comfortable with the status quo could skip the preservation process and continue receiving the same benefits they had been receiving the previous 20 years. Further, HUD permitted owners who had plans of action pending under ELIHPA to choose whether to continue under that statute or to switch to the opportunities in LIHPRHA, if they wished. 12 U.S.C. § 4101(note (b)); Pub. L.

No. 101-625, Title VI, § 604 (transitional provisions).

29. LIHPRHA also provided HUD with the discretion to approve outright prepayment at the outset of the process if certain economic conditions were met. 12 U.S.C. § 4108. For an owner to qualify for prepayment, HUD would have to make certain findings regarding the effect that prepayment would have upon the tenants and the overall supply of low-income housing in the area.

30. HUD did not deny any request by any plaintiff pursuant to LIHPRHA to exit the Federal housing program.

31. No plaintiff applied to prepay its mortgage pursuant to LIHPRHA.

32. No housing owner in Minnesota ever applied to prepay its mortgage pursuant to LIHPRHA; consequently, HUD never performed any analysis to determine whether eligibility for prepayment pursuant to LIHPRHA was possible.

33. LIHPRHA permitted HUD to provide financial incentives to owners. 12 U.S.C. § 4109. In exchange for extending the restrictions, HUD could provide owners with access to residual receipts accounts, rent increases, financing for capital improvements, greater Section 8 coverage, and access to a portion of the property's equity. 12 U.S.C. § 4109.

34. LIHPRHA permitted HUD to approve and facilitate the sale of the property based upon the property's fair market value without the HUD restrictions. 12 U.S.C. § 4110(b). Such a sale

would release the owner from the program entirely. HUD funded virtually all transaction costs, including FHA mortgage insurance.

35. LIHPRHA required HUD to approve prepayment if the incentives or benefits were not available. 12 U.S.C. § 4114. Thus, if HUD approved a plan of action to grant incentives to an owner but HUD decided not to provide funding, the owner could prepay its mortgage. Id. Also, if HUD approved a plan of action for sale, but no purchaser appeared within a specified period, or if HUD decided not to provide assistance in connection with a sale, the owner could prepay. Id.

36. LIHPRHA required HUD to complete its review of a plan of action within 180 days and, if the review extended beyond that, to provide retroactive incentives to owners as compensation. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce the distribution of retroactive incentives and the 180 day time frame. Id.

37. On April 8, 1992, the Government published an interim rule implementing HUD's procedures and standards for administering LIHPRHA, to take effect May 8, 1992.

38. The purpose of an appraisal of real property is to develop an opinion of the "market value" of the fee simple estate of each property.

39. "Market value" represents what a willing buyer would

pay a willing seller for the property in the open competitive market.

40. There are three accepted approaches to determining market value: the cost approach, the sales comparison approach, and the income capitalization approach.

41. The income capitalization approach reflects the market's perception of the relationship between the property's potential income (i.e., rents) and its market value. The relationship is expressed as a capitalization rate. This approach is widely used when appraising income-producing properties, such as the properties at issue in this case.

42. Operating as a "stabilized market rate property" means that it is assumed that the property is already full of market rate tenants and that vacancy rates are at stable market levels. This is a "hypothetical condition" because, at the valuation date, the properties were in fact operating as HUD-restricted buildings.

43. An appraisal conducted pursuant to 12 U.S.C. § 4110 determines the market value of the property at its highest and best use, accounting for the cost of converting it from HUD-restricted operation to that use.

44. Conversion of properties from HUD-restricted operation to market rate operation involves two types of conversion costs: the costs associated with upgrading the property to attract

market-rent tenants; and the costs associated with turning over units from HUD-restricted tenants to market tenants.

45. Upgrade costs include two components: the cost of completing any required repairs, defined as repairs previously required by HUD in consideration of market rate conversion, and hypothetical upgrades, defined as costs assumed necessary in order to put the property in a competitive position as a market rate project.

46. Hypothetical upgrades are assumed based upon what is typical for market rate rental housing in each property's specific local market.

47. There is a strong relationship between hypothetical upgrades and the level of market rent that a property can command. Generally, the more money spent on upgrades, the more rent a property will command on the market, up to a point of diminishing returns.

48. Turnover costs reflect the time it takes to remove HUD-restricted tenants and rent each unit to a market-rate tenant. The time it takes to achieve stabilized market rent conditions is determined by the absorption rate (units per month). The predominant factor influencing absorption rate is the local market (i.e., absorption rates are market-specific and may be different for each property and each market).

49. A 12 percent discount rate is higher than that

appropriate with a rent restricted environment.

50. In January 1995, Congress began considering a bill that would remove any limitations on the opportunity to prepay. In February 1995, HUD notified owners that such legislation was pending, but continued to process plans of action until the pending statute was passed.

51. On March 28, 1996, the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996) ("HOPE"), was enacted. HOPE extended the authorization for low-income housing programs, and in that connection Congress incorporated by reference the paragraph of H.R. 2099 that included the restoration of prepayment rights. Pub. L. No. 104-120, § 2(b), 110 Stat. at 834-35. HOPE conditioned HUD's use of funds upon, among other things, permitting eligible owners to prepay their mortgages, provided they agreed to wait 60 days before raising rents. Id.

52. HOPE permitted the prepayment of low-income housing mortgages without HUD approval as long as the owner agreed not to increase rents in the project for 60 days after prepayment. Congress deemed the 60-day period "necessary in order to make available rental assistance for eligible families who desire to stay or move." H.R. Conf. Rep. No. 104-384, 104th Cong., 1st Sess. at 47 (1995).

53. At the time HOPE was enacted, owners were required,

pursuant to 42 U.S.C. § 81437f(c)(9) (currently codified at 42 U.S.C. § 1437f(c)(8)(A)), to provide written notice to tenants at least one year prior to terminating any tenant Section 8 contract. Owners were also obligated to honor existing Housing Assistance Payment ("HAP") contracts until they expired.

54. Plaintiff, Apache Apartments of Owatonna, A Limited Partnership ("Apache"), prepayed its mortgage and exited the Federal housing program in January 2000.

55. Apache did not begun the process of exiting the Federal housing program until February 1994, five months after its September 1993 prepayment eligibility date.

56. In February 1994, Apache offered to sell Apache Apartments to a qualified purchaser pursuant to LIHPRHA.

57. In July 1994, Apache delayed its exit from the Federal housing program by applying, pursuant to LIHPRHA, for incentives to remain in the program.

58. As early as April 18, 1995, Apache was aware of legislative developments that might change the statutory regime set forth in LIHPRHA.

59. Apache renewed HAP contracts with HUD, agreeing to house low-income Section 8 tenants in its property, even after the enactment of HOPE.

60. Plaintiff Brainerd South Ltd., A Limited Partnership ("Brainerd South"), exited the Federal housing program in June

1996, when it sold its property pursuant to LIHPRHA for $1,401,836.

61. Brainerd South delayed its exit from the Federal housing program by not beginning the process of selling its property until June 22, 1992, only four months before its October 25, 1992 prepayment eligibility date, when it filed a Notice of Intent offering to sell its property to a qualified purchaser pursuant to LIHPRHA.

62. Minnesota Brokerage Group ("MBG") assisted in the sale by Brainerd South of its property.

63. The sale of Brainerd South's property was for a price that reflected what the property would have been sold for as an unrestricted conventional property.

64. Plaintiff Hopkins Village Apartments Limited Partnership ("Hopkins Village") exited the Federal housing program in March 1999, when it sold its property in an open-market, arm's length transaction (not pursuant to LIHPRHA) for approximately $5.5 million.

65. Hopkins Village delayed its exit from the Federal housing program by applying, on May 27, 1994 (over a year after its March 1993 prepayment eligibility date), for incentives to remain in the program, pursuant to LIHPRHA.

66. Hopkins Village did not begin the process of exiting the Federal housing program until, in October 1997, more than

four years after its March 1993 prepayment eligibility date, it informed its tenants of its intention to prepay its mortgage on or after November 1, 1998.

67. In February 1992, Hopkins Village entered into a HAP contract with HUD extending the terms of its 1982 HAP contract through August 31, 1997.

68. Hopkins Village renewed HAP contracts with HUD even after the enactment of HOPE.

69. In August 1997, Hopkins Village delayed its exit from the Federal housing program by entering a one-year HAP contract with HUD.

70. Hopkins Village's exit from the Federal housing program was delayed by a lawsuit filed against it by its tenants in July 1998.

71. MBG assisted in the sale by Hopkins Village of its property.

72. In December 1990, 15 months before its March 1992 prepayment eligibility date, plaintiff Rochester Square, A Limited Partnership ("Rochester Square"), began the process of applying for incentives to remain in the Federal housing program, pursuant to LIHPRHA.

73. In June 1992, Rochester Square elected to seek incentives pursuant to ELIHPA.

74. On May 17, 1995, Rochester Square agreed to remain in

the Federal housing program until March 2012 in exchange for incentives by signing a Use Agreement pursuant to ELIHPA.

75. Rochester Square requested, and HUD agreed to provide, those incentives "in exchange for [Rochester Square's] agreement to continue low-income affordability restrictions on [Rochester Square Apartments] for the remaining term of the Mortgage."

76. On July 7, 1993, Tonkaway Partnership, the then-owner of Eagan Gardens, notified HUD of its intent to extend the low-income affordability restrictions upon Eagan Gardens by requesting incentives pursuant to LIHPRHA.

77. In the early 1990s, after the enactment of ELIPHA, Tonka Gardens LLC became the owner of Eagan Gardens.

78. Tonka Gardens prepayed the mortgage on Eagan Gardens and exited the Federal housing program in September 1996.

79. On July 17, 2001, plaintiff Waseca Village Limited Partnership ("Waseca Village") notified HUD of its intent to prepay its mortgage in no less than 150 days.

80. Waseca Village prepayed its mortgage and exited the Federal housing program in April 2002.

81. Waseca Village delayed its exit from the Federal housing program by applying, in June 1994 (over a year after its May 1993 prepayment eligibility date), for incentives to remain in the program, pursuant to LIHPRHA.

82. As early as April 18, 1995, Waseca Village was aware of

legislative developments that might change the statutory regime set forth in LIHPRHA.

83. Waseca Village delayed its exit from the Federal housing program by not beginning the process of selling its property pursuant to LIHPRHA until April 1996, nearly three years after its May 1993 prepayment eligibility date.

84. Waseca Village delayed its exit from the Federal housing program by not requesting prepayment of its mortgage until December 17, 1999.

85. Waseca Village delayed its exit from the Federal housing program by withdrawing, in April 2000, its December 17, 1999 request to prepay its mortgage.

86. Waseca Village did not notify HUD of its intent to prepay its mortgage until December 1999, more than three years after its May 1993 prepayment eligibility date.

87. On April 11, 2002, Waseca Village sold its property for $1,032,949.01 to a buyer that agreed to extend the low-income affordability restriction upon Waseca Village Apartments.

88. Waseca Village renewed HAP contracts with HUD even after the enactment of HOPE.

89. In December 1990, two years before its December 1992 prepayment eligibility date, plaintiff Winona Properties, A Limited Partnership ("Winona Properties"), began the process of applying for incentives to remain in the Federal housing program

by applying for incentives pursuant to LIHPRHA.

90. In June 1992, Winona Properties elected to seek incentives pursuant to ELIPHA.

91. On May 17, 1995, Winona Properties agreed to remain in the Federal housing program until February 2013 in exchange for incentives by signing a Use Agreement pursuant to ELIHPA.

92. Winona Properties requested, and HUD agreed to provide, those incentives "in exchange for [Winona Properties'] agreement to continue low-income affordability restrictions on [Morningside Terrace] for the remaining term of the Mortgage."

93. A plaintiff that wished to exit the Federal housing program after the 20-year date would have had to incur expenses upgrading its property to a condition to attract market-rate tenants, as well as costs of turning over restricted rate tenants to market rate tenants.

94. Converting plaintiff's properties from restricted to market rents would have taken approximately one year.

95. Because a dollar earned sooner is worth more than a dollar earned later, cash flows are properly subject to discounting. Specifically, cash flows should be discounted based upon their riskiness. Lower discount rates should be used for more reliable, or less risky, cash flows.

96. Discounting is the economic process of calculating the value of cash flows back to a given point in time, taking into

account inflation, risk, and the real rate of return. Net present value is the present value of future cash flows, minus original investment. Discounting is used to obtain net present value.

97. The most appropriate measure of the economic impact of the preservation statutes upon plaintiffs' property is the change in value of their primary assets (their apartment projects) measured as of their prepayment eligibility dates. Specifically, the most appropriate measure of the seriousness of any financial loss is the percentage decrease in the value of the plaintiffs' property directly resulting from the passage of LIHPRHA (as modified by the subsequent passage of HOPE).

98. The diminution-in-value approach is appropriate because it measures the impact of the regulation upon the value of the property as a whole, rather than narrowly focusing upon the cash flows during the delay period and completely ignoring cash flows expected by plaintiffs after this period.

99. The diminution-in-value approach considers all components of a property's return during the delay period.

100. The diminution-in-value approach appropriately takes into account the duration of the alleged taking.

101. A comparison of two retrospective valuations of properties provides an estimate of the effect of delaying prepayment from the property's eligibility date until the earlier

of (1) the date the property signed a use agreement or (2) 60 days after the passage of HOPE, at which point it would convert to market-rate operation (the "delay period").

102. By measuring the economic impact as the percentage decrease in the asset value resulting from the delay, an estimate of the economic impact of delayed prepayment upon plaintiffs can be derived.

103. Measuring economic impact and just compensation based upon the delay period overstates the true measure of just compensation, because it ignores the value of the incentives offered by LIHPRHA and that plaintiffs could have acted more expeditiously in pursuing these incentives.

104. The market value of Apache Apartments on the prepayment eligibility date of September 7, 1993, subject to a hypothetical conversion of the property to market rate operation on that date, is $512,000. Assuming that conversion to market rate operation is delayed until May 27, 1996, the appraised market value of Apache Apartments on the prepayment eligibility date of September 7, 1993 is $484,000.

105. The economic impact to Apache of remaining in the Federal housing program from September 7, 1993, through May 27, 1996, was only 5.5 percent.

106. The market value of Brainerd South Apartments on the prepayment eligibility date of October 25, 1992, subject to a

hypothetical conversion of the property to market rate housing on that date, is $1,129,000. Assuming that conversion to market rate operation is delayed until May 27, 1996, the appraised market value of Brainerd South Apartments as of October 25, 1992 is $961,000.

107. The economic impact to Brainerd South of remaining in the Federal housing program from October 25, 1992, through May 27, 1996, was only 14.9 percent.

108. The market value of Hopkins Village Apartments on the prepayment eligibility date of March 26, 1993, subject to a hypothetical conversion of the property to market rate operation on that date, is $4,553,000. Assuming that conversion to market rate operation is delayed until May 27, 1996, the appraised market value of Hopkins Village as of March 26, 1993 is $3,901,000.

109. The economic impact to Hopkins Village of remaining in the Federal housing program from March 26, 1993, through May 27, 1996, was only 14.3 percent.

110. The market value of Rochester Square Apartments on the prepayment eligibility date of March 15, 1992, subject to a hypothetical conversion of the property to market rate operation on that date, is $2,409,000. Assuming that conversion to market rate operation is delayed until May 17, 1995 (the date on which the owners signed a use agreement with HUD), the appraised market

value of Rochester Square as of March 15, 1992 is $2,009,000.

111. The economic impact to Rochester Square of remaining in the Federal housing program from March 15, 1992, through May 17, 1995, was only 16.6 percent.

112. The market value of Eagan Green Apartments on the prepayment eligibility date of May 30, 1994, subject to a hypothetical conversion of the property to market rate operation on that date, is $4,729,000. Assuming that conversion to market rate operation is delayed until May 27, 1996, the appraised market value of Apache Apartments on the prepayment eligibility date of September 7, 1993 is $4,604,000.

113. The economic impact to Tonka Gardens of remaining in the Federal housing program from May 30, 1994, through May 27, 1996, was only 2.6 percent.

114. The market value of Waseca Village Apartments on the prepayment eligibility date of May 2, 1993, subject to a hypothetical conversion of the property to market rate operation on that date, is $885,000. Assuming that conversion to market rate operation is delayed until May 27, 1996,the appraised market value of Waseca Village Apartments as of May 2, 1993, is $835,000.

115. The economic impact to Waseca of remaining in the Federal housing program from May 2, 1993, through May 27, 1996, was only 5.6 percent.

116. The market value of Morningside Terrace, the property of Winona Properties, on the prepayment eligibility date of December 27, 1992, subject to a hypothetical conversion of the property to market rate operation on that date, is $1,066,000. Assuming that conversion to market rate operation is delayed until May 17, 1995 (the date on which the owners signed a use agreement with HUD), the appraised market value of Morningside Terrace (Winona) as of December 27, 1992 is $484,000.

117. The economic impact to Winona Properties of remaining in the Federal housing program from December 27, 1992, through May 17, 1995, was only 8.9 percent.

118. Just compensation can be calculated by bringing forward the measure of economic impact (measured as the difference in property values resulting from the delay in prepayment) to the date of judgment using an appropriate prejudgment interest rate.

119. Measuring just compensation based upon the delay period overstates the true measure of just compensation, because it ignores the value of the incentives offered by LIHPRHA and that plaintiffs could have acted more expeditiously in pursuing these incentives.

120. The appropriate prejudgment interest rate in this case is the rate on a low-risk security with a term roughly equal to the length of time between the time economic impact is measured

(at the beginning of the delay period) and the date of judgment. The most appropriate rate is the yield on 10-year Treasury STRIPS.

121. Plaintiffs New Goldendale Homes, Limited Partnership, and New Howard Lake, Limited Partnership, have stipulated to the dismissal of their claims.

PROPOSED CONCLUSIONS OF LAW

122. Because New Goldendale Homes and New Howard Lake have stipulated to the dismissal of their claims, their claims are no longer before the Court.

123. Because the earliest plaintiffs could have prepaid their mortgages was after the enactment of LIHPRHA, ELIPHA had no effect upon plaintiffs' property rights and, therefore, is not an issue in this case. See Chancellor Manor v. United States, 331 F.3d 891, 905 n.7 (Fed. Cir. 2003).

124. Because Plaintiffs' First Amended Complaint raises no challenge to HOPE or Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487 (1998), whether the application of either statute constitutes a regulatory taking of any of plaintiffs' property is not properly before the Court.

125. Because the option to prepay a mortgage after 20 years is only an issue insofar as it was a trigger for exiting the Federal housing program, see Chancellor Manor, 331 F.3d at 903, the issue in this case is whether Government application of

LIHPRHA to plaintiffs' properties denied plaintiffs the right to exit the Federal housing program.

126. Because 12 U.S.C. § 4102 required an owner of eligible low-income housing that intended to terminate the low-income affordability restrictions through prepayment of its mortgage to file with HUD a formal notice of that intent, indications of such an intent by other means are insufficient to demonstrate that an owner applied to prepay a mortgage pursuant to LIHPRHA, and responses by HUD employees to such other indications are insufficient to demonstrate that an owner was denied an application to prepay its mortgage pursuant to LIHPRHA.

127. Because plaintiffs never applied to prepay their mortgages pursuant to LIHPRHA, and because HUD never denied any request by plaintiffs pursuant to LIHPRHA to prepay their mortgages, plaintiffs' claims that the Government took their property by restricting their prepayment rights are not ripe for judicial review. Greenbrier v. United States, 193 F.3d 1348, 1359 (Fed. Cir. 1999).

128. Because no taking occurs to the extent that the operation of a Federal statute restricting property rights provides compensation, exhaustion of the statutory remedy is necessary to determine the extent of any taking. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1018 & n.21 (1984). Indeed, at least where the statute provides for monetary compensation, cf.

Whitney Benefits v. United States, 752 F.2d 1554, 1556, 1560 (Fed. Cir. 1985) (holding that statutory land exchange was an optional remedy for claimant who could reject the option in favor of a Tucker Act suit), the Tucker Act is available to cover any shortfall between the statutory remedy and just compensation. See Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 154-56 (1974). Consequently, because Apache, Hopkins Village, Tonka Gardens, and Waseca Village never completed the process of applying for relief pursuant to LIHPRHA, their takings claims are not ripe for judicial review. Cf. Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985) (holding that takings claim was not ripe where claimant had not sought State compensation procedures). That is the case regardless of whether those plaintiffs abandoned their pursuit of LIHPRHA relief only after HOPE restored their prepayment rights. Cf. Boise Cascade Corp. v. United States, 296 F.2d 1339, 1347-48 (Fed. Cir. 2002) (holding that owner's takings claim was not ripe because restriction upon owner's property was lifted before Government action upon owner's application for relief from restriction).

129. The takings claims of Apache, Hopkins Village, Tonka Gardens, and Waseca Village are also not ripe because mortgage prepayment was available to owners for whom requested incentives or a sale became unavailable (12 U.S.C. § 4114); therefore,

because those plaintiffs did not pursue their applications for LIHPRHA relief to finality, it is impossible to know that those plaintiffs would not have been able to exit the Federal housing program through mortgage prepayment. Cf. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir.) (holding that takings claim of mine owner was not ripe because owner's refusal to pursue available avenue for relief pursuant to Surface Mining Control and Reclamation Act prevented the court "from knowing whether or to what extent the agency will restrict the use of the property at issue"), cert. denied, 126 S. Ct. 385 (2005).

130. No plaintiff suffered any violation of the Fifth Amendment prohibition upon taking without just compensation.

131. No plaintiff suffered any regulatory taking of its right to exit the Federal housing program.

132. A regulatory takings analysis aims to identify regulatory actions that are functionally equivalent to the classic taking in which Government directly appropriates private property or ousts the owner from his domain. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 125 S. Ct. 2074, 2082 (2005). Because Government actions pursuant to LIHPRHA were not the functional equivalent of direct appropriation of private property or the ousting of an owner from his domain, any actions of the Government pursuant to LIHPRHA respecting plaintiffs' properties were not a taking.

133. HUD's actions in this case do not constitute takings pursuant to the factors set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978): the nature of any HUD action application of LIHPRHA to plaintiffs' properties had the character of rent control in furtherance of the public welfare, permitted plaintiffs to continue to own and rent their properties at existing or higher rents or to sell their properties at a fair market price, and had only a minor and temporary economic impact, if any, upon plaintiffs. Cf. id. at 138 (holding that restrictions did not amount to a taking where they were substantially related to the promotion of the general welfare and not only permitted reasonable beneficial use of the property but also afforded owners opportunities further to enhance not only owners' property but also other properties); Conti v. United States, 291 F.3d 1334, 1343 (Fed. Cir. 2002) (holding that owner's continuing ability to sell or put property to other uses precluded a finding that a Penn Central regulatory taking had occurred), cert. denied, 537 U.S. 1112 (2003).

134. Even assuming that the application of LIHPRHA to plaintiffs' properties "took" plaintiffs' right to exclude others, that is not sufficient to establish a taking. See PruneYard Shopping Center v. Robins, 447 U.S. 74, 82-83 (1980).

135. Because a requirement that a person obtain a permit before engaging in a certain use of his or her property does not

itself "take" the property in any sense, United States v. Riverside Bayview Homes, 474 U.S. 121, 127 (1985); Bass Enters. Production Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004), LIHPRHA's requirement that an owner obtain HUD approval to prepay its mortgage did not, itself, take any property. See Greenbrier, 193 F.3d at 1357-58.

136. Showing that one has been denied the ability to exploit a property interest one had believed was available for development is insufficient to establish a taking, see Penn Central, 438 U.S. at 130; therefore, a mere showing that plaintiffs have been denied an anticipated ability to rent property at market rates would not establish a taking.

137. The mere fact that a regulation that deprives a property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation pursuant to the Fifth Amendment, United States v. Central Eureka Mining Co., 357 U.S. 155, 168 (1958), and the mere "loss of future profits" provides a "slender reed upon which to rest a takings claim," see Andrus v. Allard, 444 U.S. 51, 66 (1979); therefore, that application of LIHPRHA to plaintiffs' property may have deprived plaintiffs of the most profitable use of their property is not necessarily enough to establish a right to compensation pursuant to the Fifth Amendment.

138. Because a taking is less likely to be found when the

challenged interference with a property interest "arises from some public program adjusting the benefits and burdens of economic life to promote the common good," than when the interference entails a physical invasion of the property by the government, see Penn Central, 438 U.S. at 124, the fact that LIHPRHA was intended to promote the common good by preserving low-income housing is an indication that any application of LIHPRHA to plaintiffs' property was not a taking.

139. HUD's actions in this case did not have the character of a taking because they were in service of the public interest in preserving the supply of low-income housing, were not in bad faith, were part of processing applications for relief pursuant to statutory mechanisms, only temporarily delayed plaintiffs who did not choose to remain in the Federal housing program from exiting the program, and provided the opportunity to accept valuable incentives in exchange for remaining in the Federal housing program.

140. Any HUD actions pursuant to LIHPRHA had the character of rent control; which, in light of the Government's broad power to regulate the economic relations of landlords and tenants, statutes regulating such relationships do not, by themselves, possess the character of a taking. See Yee v. City of Escondido, 503 U.S. 519, 528-29 (1992); FCC v. Florida Power Corp., 480 U.S. 245, 252 (1987).

141. Because the regulation of the landlord-tenant relationship does not generally require payment of compensation for all economic injuries that such regulation entails, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982) (citing Bowles v. Willingham, 321 U.S. 503 (1944) (rent control); Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398 (1934) (mortgage moratorium); Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242 (1922) (emergency housing law); Block v. Hirsh, 256 U.S. 135 (1921) (rent control)), the temporary continuation of low-income affordability restriction upon plaintiffs' properties, even if without compensation, does not necessarily amount to a taking of their property.

142. Any application of LIHPRHA to plaintiffs' property did not "go too far;" it merely extended the low-income restrictions upon the use of plaintiffs' property until plaintiffs either decided to extend those restrictions in exchange for incentives or sold their property to a buyer that would maintain those restrictions. Cf. Block, 256 U.S. at 156-58 (holding that temporary war-time statute extending the right of a tenant to occupy rental property at original lease terms beyond expiration of a lease did not go too far so as to amount to a taking).

143. Because plaintiffs could, pursuant to LIHPRHA, continue to rent their property and receive the annual return that they had been receiving prior to the 20th anniversary of the

final endorsement of their mortgage notes, application of LIHPRHA to plaintiffs' properties did not constitute a regulatory taking. Cf. Fed. Home Loan Mortage Corp. v. New York State Div. of Hous. & Cmty. Renewal, 83 F.3d 45, 48 (2d Cir. 1996) (rejecting argument that application of Rent Stabilization Law constituted a regulatory taking where, although the property owner "will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents."), cert. denied, 470 U.S. 1087 (1985).

144. A major portion of a property's value must be destroyed before a regulatory taking occurs, and loss of anticipated gains or future profits is not usually sufficient to constitute a taking. See Moore v. City of Costa Mesa, 886 F.2d 260, 263 (9th Cir. 1989), cert. denied, 496 U.S. 906 (1990). Consequently, plaintiffs, who did not suffer the destruction of a major portion of their property and, at the most, experienced a temporary period during which they may not have been able to earn additional return on their investment through conversion to market rents, did not suffer a taking.

145. Because the economic impact of a regulation is "measured by the change, if any, in the fair market value caused by the regulatory imposition," Florida Rock Indus. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994), cert. denied, 513 U.S. 1109 (1995), in measuring the economic impact of the

application of LIHPRHA to plaintiffs' properties, consideration must be given to any benefits that LIHPRHA provided. See Chancellor Manor, 331 F.3d at 905; see also Penn Central, 438 U.S. at 137 (holding that transferable development rights were to be taken into account in considering impact of regulation of use of airspace above railroad terminal).

146. Plaintiffs suffered no economic impact as a result of the application of LIHPRHA to their property that would amount to a taking. By offering plaintiffs the opportunity to sell their properties at a market rate, to sign a Use Agreement, and for retroactive benefits, LIHPRHA mitigated or eliminated whatever financial burdens were imposed upon plaintiffs.

147. LIHPRHA avoided disproportionately shifting the burden of providing low-income housing onto plaintiffs by offering incentives to owners willing to remain in the Federal housing program and offering an opportunity to sell their property at a fair market price to owners who wanted to exit the Federal housing program.

148. As long as there is found to exist a "solid and adequate fair market value" that claimants could have obtained for their properties, that would be a sufficient remaining use of the properties to forestall a determination that a taking had occurred or that any just compensation had to be paid by the Government. Florida Rock Indus. v. United States, 791 F.2d 893,

903 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987). Thus, the opportunity to sell their properties at a price established by appraisals of the property's unrestricted market value, 12 U.S.C. § 4110, and the opportunity to obtain incentives in exchange for the execution of a Use Agreement that would commit the owner to an additional period of affordability restrictions, 12 U.S.C. § 4109(a), removed any potential loss that the restriction upon prepayment rights could have caused.

149. To determine the economic impact of a regulatory taking, the Court must "compare the value that has been taken from the property with the value that remains in the property." Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 497 (1987). This factor is usually determined by a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered. Bass Enterprises, 54 Fed. Cl. at 404.

150. Because profit-based calculations are an inadequate substitute for the required evidence demonstrating the degree of diminution in the property's value, see Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir.), cert. denied, sub nom., RCK Props., Inc. v. United States, 528 U.S. 951 (1999), economic impact cannot be measured by putting profit in the denominator of the diminution calculation.

151. The duration of a restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim, Tahoe-Sierra Preservation Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 342 (2002); accordingly, any analysis of the economic impact of the application of LIHPRHA to plaintiffs' property must take into account the length of the period of any restriction upon plaintiffs' property rights caused by that application. Cf. Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004) ("In considering whether the economic deprivation here was of the requisite severity, the court should also consider the significance of the fact that the regulations restricted Rose Acres operations temporarily--for a period of about two years--after which Rose Acre returned to pre-restriction table egg sales levels."), cert. denied, 125 S. Ct. 2541 (2005).

152. Because only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a regulatory taking has occurred, Riverside Bayview Homes, 474 U.S. at 127, plaintiffs, who neither were denied an application to prepay by HUD nor were prevented economically viable use of their property, suffered no taking of their property.

153. Because any economic impact of any restriction of plaintiffs' prepayment rights caused by the application of

LIHPRHA to their property did not diminish the value of any plaintiff's property by more than 16.6 percent, that impact weighs against plaintiffs' takings claims. See Rose Acre, 373 F.3d at 1187 (acknowledging that large diminutions in value had been held insufficient for takings purposes in particular cases; citing Euclid v. Ambler Realty Co., 272 U.S. 365 (1926) (75 percent value diminution) and Hadacheck v. Sebastian, 239 U.S. 394 (1915) (87 1/2 percent)); see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 645 (1993) (46 percent diminution); Maritrans Inc. v. United States, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (holding that 13.1 percent decline in value weighed against takings claim); Jentgen v. United States, 228 Ct. Cl. 527, 532-33, 657 F.2d 1210, 1213 (1981) (claimed diminution from $150,000 to as much as $80,000), cert. denied, 455 U.S. 1017 (1982); Walcek v. United States, 49 Fed. Cl. 248, 271-72 (2001), aff'd, 303 F.3d 1349 (Fed. Cir. 2002) (59.7 percent diminution).

154. Because under the Penn Central analysis, courts consider whether the challenged Government conduct affected the plaintiffs' "primary expectation concerning the use" of the affected property, Penn Central, 438 U.S. at 134; an expectation that a mortgage could be prepaid without HUD approval as much as twenty years in the future, in view of all the benefits that accrued to owners from entering the Federal housing program, is

insufficient to establish that the application of LIHPRHA to plaintiffs’ property frustrated plaintiffs’ reasonable investment-backed expectations when they entered the Federal housing program.

155. Because where multiple uses can be expected of property, but the law does not interfere with an owner's "primary" investment-backed expectation, a taking will not lie, see Penn Central, 438 U.S. at 136; MacLeod v. County of Santa Clara, 749 F.2d 541, 547 (9th Cir. 1984), cert. denied, 472 U.S. 1009 (1985), and because any application of LIHPRHA to plaintiffs’ properties did not prevent plaintiffs from continuing to own those properties, using them as rental properties, or selling them, application of LIHPRHA to plaintiffs’ properties did not so frustrate plaintiffs’ reasonable investment-backed expectations concerning their properties as to amount to a taking. Cf. Penn Central, 438 U.S. at 136 (holding that designation of Grand Central Station as a landmark permitted existing use of property and, therefore, did not interfere with owner’s primary expectation concerning use of parcel).

156. The restrictions upon prepayment of HUD-insured mortgages that existed when Tonka Gardens became the owner of that property are relevant to whether Tonka Gardens had a reasonable investment-backed expectation that it could prepay that mortgage upon the 20th anniversary of the final endorsement

of the Eagan Gardens mortgage, see Rith Energy, Inc. v. United States, 270 F.3d 1347, 1350-51 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002), and indicates that Tonka Gardens did not suffer a regulatory taking.

157. HUD did not take the ability of Rochester Square or Winona Properties to exit the Federal housing program; Rochester Square and Winona Properties agreed to remain in the Federal housing program when they entered into Use Agreements with HUD.

158. Even if HUD took the property of Rochester Square, Winona Properties, and Brainerd South, because a statute that provides a property owner the option of accepting a substitute benefit in exchange for its property is a method of ascertaining and paying just compensation for a taking and, thereby, settling a money claim, see Whitney Benefits v. United States, 752 F.2d at 1556, 1560, Rochester Square, Winona Properties, and Brainerd South, by accepting relief pursuant to LIHPRHA, have no claim that the Government violated the Just Compensation clause.

159. HUD did not take the ability of Brainerd South to exit the Federal housing program, HUD facilitated Brainerd South's exit from the program through the sale of its property at a fair market price.

160. Even if HUD took the ability of Brainerd South to exit the Federal housing program; Brainerd South received just compensation for that taking through the sale of its property;

because a sale pursuant to LIHPRHA is essentially a sale at market value, cf. Parkridge Investors Ltd. P'ship v. Farmers Home Admin., 13 F.3d 1192, 1199 (8th Cir.) (discussing statutory sale option available to owner of apartment complex constructed with financing obtained from Farmers Home Administration), cert. denied, 511 U.S. 1142 (1994), Brainerd South did not suffer any taking without just compensation.

161. Because the enactment of HOPE on March 28, 1996, restored owners' prepayment rights, see Chancellor Manor, 331 F.3d at 896, Cienega Gardens v. United States, 331 F.3d 1319, 1326-27 (Fed. Cir. 2003), any property that was taken by the application of LIHPRHA to plaintiffs' property was restored to plaintiffs on March 28, 1996, and, therefore, any takings period in this case ended upon the enactment of HOPE.

162. Because (1) just compensation for a taking is measured at the time of the alleged taking, First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 320 n.10 (1987), and does not include compensation for the consequences of the alleged taking, Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990), (2) the economic impact of an alleged taking must be measured with reference to the parcel as a whole, Keystone Bituminous Coal, 480 U.S. at 497; Penn Central, 438 U.S. at 130-31; Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993), and (3) an attempt to divide

property interest into temporal segments to establish that property was deprived of all economic use during a particular period of time is flawed, see Tahoe-Sierra, 535 U.S. at 331; Maritrans, 342 F.3d at 1355, any method that measures only the consequences of an application of LIHPRHA to plaintiffs' property is insufficient to establish a taking.

163. Just compensation (to the extent that it is found to be owed) should be measured by the difference between the property's fair market value without the regulatory restriction and its fair market value with the regulatory restriction. See Wheeler v. Pleasant Grove, 833 F.2d 267, 271 (11th Cir. 1987); Nemmers v. City of Dubuque, 764 F.2d 502, 505 (8th Cir. 1985).

164. If plaintiffs are entitled to compensation in this case, then the amount of compensation for each plaintiff should be no more than the following, assuming that prejudgment interest is compounded as simple interest:

| | |
|---|---|
| Apache | $47,519 |
| Brainerd South | $324,365 |
| Hopkins Village | $1,187,108 |
| Rochester Square | $834,801 |
| Tonka Gardens | $229,829 |
| Waseca Village | $90,271 |
| Winona Properties | $180,906 |

165. When a taking is found, an owner is entitled only to

interest sufficient to place it in the same financial position it would have occupied if the payment had coincided with the appropriation. See Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984). The basis for the interest award that typically accompanies a takings award, when a sum equal to value of the property taken is returned, is to provide the plaintiff with the lost opportunity to earn interest on its principal. Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411, 413 (1994).

166. Traditionally, only simple interest is allowed for just compensation claims. See Calhoun v. United States, 197 Ct. Cl. 41, 59, 453 F.2d 1385, 1396 (1972) ("simple interest (as part of just compensation) is to accrue"); Paul v. United States, 21 Cl. Ct. 415, 428 (1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991); Yaist v. United States, 17 Cl. Ct. 246, 262 (1989). In exercising the discretion to award compound interest, a court should consider the nature of the property taken as well as the manner in which the taking affected plaintiffs' investment opportunities. See Rose Acre Farms v. United States, 55 Fed. Cl. 643, 665-66003), vacated on other grounds, 373 F.3d 1177 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 2541, 2543 (2005). In the event compensation is awarded in this case, only simple interest should be allowed. Cf. Heydt v. United States, 38 Fed. Cl. 286, 314 (1997) (holding that the plaintiff was entitled to simple

interest upon temporary taking).

167. Although a taking may result when an "extraordinary delay in Governmental decisionmaking" occurs, Bass Enters. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004), no plaintiff experienced an extraordinary delay in HUD decisionmaking over a request for relief pursuant to ELIPHA or LIHPRHA that might have resulted in a taking. Cf. id. (holding that Federal oil and gas leases on land condemned by Federal Government for construction of nuclear waste storage facility were not temporarily taken as result of Bureau of Land Management's 45 month delay in making its permitting decision).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
KENNETH M. DINTZER
Senior Trial Counsel
KENNETH D. WOODROW
SEAN DUNN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

April 18, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on April 18, 2006 the foregoing Defendant’s Proposed Findings Of Fact And Conclusions Of Law was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail